A. J. MENEFEE v. THE STATE.

No. 1690.  Decided June 5, 1912.

Rehearing denied June 26, 1912.

**1.—Murder—Continuance—Misconduct of Jury—Practice on Appeal.**

Where, upon appeal from a conviction of murder, it appeared that the alleged reasons for a continuance and misconduct of the jury are not likely to occur upon another trial, the same need not be reviewed.

**2.—Same—Change of Venue.**

This court disposes of the motion for change of venue with the statement that conditions may be different upon another trial, but if they should not be, a change of venue should be granted.

**3.—Same—Charge of Court—Murder in the Second Degree—Circumstantial Evidence—Rule Stated.**

Before the trial court would be authorized to refuse a charge on murder in the second degree, the case being one of circumstantial evidence, the facts and circumstances must exclude murder in the second degree, and must further be of such cogent character as to constitute murder in the first degree to the exclusion of murder in the second degree.

**4.—Same—Charge of Court—Case Stated.**

Where, upon trial of murder, the case was one of circumstantial evidence, and there was no testimony that the defendant was present at the time and place of the homicide, and the defendant's testimony expressly excluded his presence, and there was no testimony as to the facts and circumstances at the time of the homicide whether the meeting of the parties was accidental, etc., it was reversible error not to have submitted a charge on murder in the second degree.

**5.—Same—Charge of Court—Principals.**

Where, upon trial of murder, the court charged the jury that if defendant, acting together with another, killed deceased with malice aforethought he would be guilty of murder in the first degree, and did not define the law of principals, which required that defendant must have been present knowing the unlawful intent, etc., the same was reversible error.

**6.—Same—Charge of Court—Accomplice—Principals.**

Where defendant was indicted as a principal, and there being evidence showing that he was not present at the homicide, this required a charge that the jury could not convict him as a principal under that state of case, although they might have believed him to be an accomplice or an accessory. In order to convict as a principal, the accused must be indicted as such and the evidence must sustain such indictment.

**7.—Same—Charge of Court—Principal—Statement Introduced by State.**

Where the language of the charge authorized the jury to convict whether defendant was present or not, and solely upon the ground that he may have been connected in some way with another in the killing, and the evidence excludes the fact that appellant did the killing but showed that another did it and the State proved this by such other person's statement, the State is bound thereby and the court should have charged that defendant could not be convicted as a principal.

**8.—Same—Evidence—Declarations of Third Parties.**

Upon trial of murder, it was reversible error to admit in evidence the declarations between third parties with reference to a clandestine meeting between the wife of the codefendant and another, there being no connection shown with defendant.

**9.—Same—Evidence—Declarations of Third Parties.**

Upon trial of murder, a conversation occurring between the codefendant and third party, as to a message which the latter was to convey to the defendant but which was never communicated to him, was inadmissible.

**10.—Same—Evidence—Attorney and Client—Confidential Communication.**

Upon trial of murder, communications between attorney and the defendant, in which the attorney gave him professional advice were inadmissible in evidence.

**11.—Same—Evidence—Other Offenses.**

Upon trial of murder, it was permissible to show defendant's ill-will toward

deceased for his attempted prosecution in regard to a certain alleged offense with which defendant was said to have been connected, but the details of such matter in regard to the birth of the alleged child and the acts of the parties were inadmissible.

### 12.—Same—Evidence—Extraneous Matters.

Upon trial of murder, where the State was permitted not only to show that certain extraneous matters had occurred which involved defendant and his possible ill-will against the deceased, but also to go into all the details and circumstances at great length, the same constituted error.

### 13.—Same—Discussion of Facts—Motion for Rehearing.

Where the State filed a motion for rehearing in which it contended that this court was in error in stating the facts upon which it based its rulings in reversing the case, but the record bore out the statement of the court in the various matters assigned, there was no error, and the motion for rehearing is overruled.

Appeal from the District Court of Hill. Tried below before the Hon. C. M. Smithdeal.

Appeal from a conviction of murder in the first degree; penalty, imprisonment in the penitentiary for life.

The opinion states the case.

*Morrow & Morrow, C. F. Greenwood* and *W. Poindexter,* for appellant.—On question of admitting testimony as to extraneous matters: Powdrill v. State, 62 Texas Crim. Rep., 442, 138 S. W. Rep., 114; Stanley v. State, 62 Texas Crim. Rep., 306, 137 S. W. Rep., 703; Green v. State, 90 S. W. Rep., 1115; O'Quinn v. State, 55 Texas Crim. Rep., 18, 115 S. W. Rep., 39; Figaroa v. State, 58 Texas Crim. Rep., 611, 127 S. W. Rep., 196.

On question of admitting collateral matter to the main issue: Thomas v. State, 14 Texas Crim. App., 70; Bennett v. State, 24 id., 73; Erwin v. State, 32 Texas Crim. Rep., 519; Finley v. State, 47 S. W. Rep., 1015.

On question of the court's failure to charge on murder in second degree: Trijo v. State, 45 Texas Crim. Rep., 127; Bennett v. State, 48 S. W. Rep., 69; Lancaster v. State, 31 S. W. Rep., 515; Cordono v. State, 56 Texas Crim. Rep., 447, 120 S. W. Rep., 471.

On the court's failure to distinguish between principals and accomplice: Pedro v. State, 88 S. W. Rep., 233; Rhodes v. State, 45 S. W. Rep., 1009; Redd v. State, 47 S. W. Rep., 1003; Abbata v. State, 51 Texas Crim. Rep., 510, 102 S. W., 1125.

Upon question of exculpatory statement introduced by the State: Combs v. State, 52 Texas Crim. Rep., 613; Banks v. State, 56 id., 262; Pratt v. State, 53 id., 281.

*C. E. Lane,* Assistant Attorney-General, *A. M. Frazier,* County Attorney, *W. C. Weir, V. L. Shurtleff, Collins & Cummings,* and *J. E. Clark,* for the State.—Upon the question of admitting the testimony of Fannie Friar with reference to other offenses: Hamblin v. State,

50 S. W. Rep., 1019; Rice v. State, 112 S. W. Rep., 299; Weaver v. State, 46 Texas Crim. Rep., 607; Porch v. State, 50 id., 341; Cross v. State, 31 id., 312; Jones v. State, 4 Texas Crim. App., 436.

On question of admitting in evidence the testimony of Mary Fox, with reference to extraneous matters: James v. State, 62 Texas Crim. Rep., 610, 138 S. W. Rep., 612; Hull v. State, 47 S. W. Rep., 472.

On question of the court's charge: Harrell v. State, 39 Texas Crim. Rep., 204; Martinez v. State, 16 S. W. Rep., 768.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of murder in the first degree under an indictment charging him with the murder of Frank Glasgow.

The record is very voluminous and shows many exceptions taken to the ruling of the court during the trial. These involve the application for continuance, change of venue, charges given and refused as well as evidence admitted and rejected. The theory of the prosecution was that appellant was a principal in the transaction, and upon this theory the case was tried. In view of the disposition of the case, some of the troublesome questions will not be discussed, among others, the application for a continuance, motion to change the venue, and the alleged misconduct of the jury.

In regard to the application for continuance, and the matters growing out of the jury question, it is sufficient to say that they will scarcely arise on another trial, and can not do so as they occurred upon the trial from which this is an appeal.

We will dispose of the motion for change of venue with the statement that if an application is again made, and the evidence is such as was developed by this record, the motion should be granted.

Murder in the first degree alone was submitted. Submitting this to the jury the court thus applied the law:

"Now, if you believe from the evidence beyond a reasonable doubt that the defendant, A. J. Menefee, did in the County of Hill and State of Texas, on or about the 21st day of June, A. D. 1911, as charged in the indictment, with express malice aforethought, with a gun, being a deadly weapon or instrument well calculated and likely to produce death by the manner in which it was used, with a sedate and deliberate mind and formed design, acting together with one Jim Fox, unlawfully shoot and thereby kill the said Frank Glasgow, you will find him guilty of murder in the first degree," etc.

This is the only allusion to the law of principals, or the law of accomplices, found in the court's charge. Error is also properly reserved to the failure of the court to charge upon murder in the second degree. Error is also properly reserved to the failure of the court to charge the law of accomplices, that is if appellant was not a principal but only an accomplice, then he could not be convicted under this indictment.

These three errors are mentioned, as they may be considered to-

gether. The case is purely one of circumstantial evidence. No witness testified to the presence of the defendant at the time and place of the homicide. Evidence for the defendant expressly excludes his presence. We deem it hardly necessary to state the evidence in this connection as it is voluminous, but the State failed to show appellant's presence, and the defendant proved by several witnesses that he was at home and in bed at the time of the homicide, and had no connection with the killing. The State proved by the witness Sanders that he saw two men at or near the Presbyterian church where the homicide is shown to have occurred about 12 or 12:30 o'clock at night. He says that he recognized one of these as being appellant; he was at a distance of something like 175 to 200 feet. The homicide occurred about 3:30 or 4 o'clock, three or four hours after Sanders says he saw these two men at the point designated. Several witnesses testified they passed this identical spot between the time mentioned by Sanders and the time of the homicide and one of them shortly before the shooting. This testimony covers most of the time, or at least a large portion of the time between the time Sanders says he saw appellant at that point and the time of the homicide. The defendant proved by his wife and others that he was at home and did not leave home that night at all until the sheriff or officers came to his home some time after the homicide, when he got up, dressed and went away with the officers. The details of this testimony, we think, would be of no particular value, and, therefore, it is not stated.

The statement of James Fox was introduced by the State. This shows that shortly after the killing, say fifteen or twenty minutes, Fox called up the sheriff and surrendered to him, with the statement that he had killed deceased by shooting him twice with a shotgun, handing the shotgun to the sheriff. Both barrels of this shotgun had been recently discharged. Deceased had been twice shot with a shotgun. The shells used by Fox in shooting were the same character exactly as those he had on his person. These shells had been bought by Fox about 12 o'clock that night from a hardware man. These shells are accurately described, and are shown to have been the shells used by Fox. It is a conceded fact also that there were but two shots fired. The details of the killing on the part of Fox were not stated in the evidence either through Fox's statement, or from any other source, otherwise than the deceased was shot about 3:30 or 4 o'clock in the morning at the point designated by Fox. To connect defendant with the matter as best it could the State proved animosity on the part of appellant towards deceased, and undertook to show that deceased had been intimate with Fox's wife. The evidence does show, we think, with reasonable accuracy, if not certainly, that Fox killed the deceased on account of insulting conduct and language and matters in connection with his, Fox's wife on part of deceased. There are several matters introduced by the State to show animosity and motive on the part of appellant. The State showed that Fox was at appellant's

house that night somewhere about 11 o'clock, and appellant was heard
to state to Fox, in substance, "take this and buy you a breakfast."
This seems to have been a quarter of a dollar given by defendant to
Fox with which to pay for his breakfast, and it is shown fairly well
that Fox instead of using the money to pay for his breakfast purchased
the shells he subsequently used in killing the deceased. It is also in
evidence that appellant advised Fox to dispose of his gun and use the
money in going somewhere to secure employment. This is but a very
short statement of the case, the evidence being very voluminous.

Under the evidence the court should have given in charge the law of
murder in the second degree. Before the court would be authorized to
refuse a charge on murder in the second degree, the case being one of
circumstantial evidence, the facts and circumstances must exclude
murder in the second degree, and must further be of such cogent char-
acter as to constitute murder in the first degree to the exclusion of
murder in the second degree. For collation of authorities see Branch's
Crim. Law, section 427. If there should be any doubt, however slight,
the court should not solve that doubt against the defendant, but should
leave the matter to be decided by the jury under appropriate instruc-
tions. Whether this was an accidental meeting on the part of the
slayer with deceased the evidence does not show. The facts and cir-
cumstances attending the meeting are not given. Of course, if appel-
lant was not present he could not be held as a principal, but if he was
present and Fox, on meeting the deceased, had demanded an apology,
and deceased had become the aggressor, the case would doubtless not
be higher than manslaughter, and might suggest the issue of self-
defense. These are matters not made certain by the testimony in the
case, and in fact upon these questions the record is silent. All doubts
on issues of this character are in favor of the accused, and not against
him. We hold, therefore, the court was in error in not charging upon
the issue of murder in the second degree.

The charge given by the court in regard to principals has been
stated. This informed the jury that if appellant, acting together with
James Fox, killed deceased on his malice aforethought, he would be
guilty of murder in the first degree. The law of principals is nowhere
defined other than as stated, and left the jury to ascertain as best they
could what the court meant by "acting together with Jim Fox." The
law of principals is, that the defendant in order to be held as a prin-
cipal must have been present, knowing the unlawful intent of Fox,
aided and assisted, or encouraged by acts or words Fox in shooting
the deceased, and this upon express malice aforethought, in order to
render him guilty of murder in the first degree. If it is conceded
that Fox is guilty of murder in the second degree, and this is not
excluded by the evidence, except upon the mere fact of proof of the
killing, then appellant would not be guilty of a higher offense than
murder in the second degree. The court, under the facts of this case,
and under the charge given, eliminated from the consideration of the

jury one of the most important, if not the most important, questions in the case, if it be conceded Fox did the killing and would have been guilty of murder, that is appellant's presence. Under the facts if Fox killed the deceased under the advice of appellant, and appellant furnished him the means by which it was done, but was absent and not then doing something in furtherance of the common design under the law of principals so as to make him either bodily or constructively present, then appellant would not be guilty as a principal under our statute and under the allegations in the indictment. The court should, therefore, have charged the jury the law of accomplices, to the effect that if Fox killed the deceased and appellant was not present, then appellant could not be convicted under this indictment as a principal. It is true the court gave a charge on alibi, but that does not meet the question. The law of the case must be given in charge to the jury, and the law of principals should have been given in the first instance, and in the second place the jury should have been charged with reference to the law of accomplices. See Branch's Criminal Law, section 683. Appellant being indicted as a principal, and there being evidence showing that he was not present, this required a charge that the jury could not convict as a principal under that state of case, and this although the jury might have believed him to be an accomplice or an accessory. In order to convict as a principal, the accused must be indicted as such, and the evidence must sustain such indictment. Recurring to that portion of the charge a moment which instructed the jury, if appellant, acting together with James Fox, killed deceased, the jury may have believed and could have believed that his presence, or his acting as a principal was not necessary; that under that peculiar language if he was in any way connected with Fox in the killing, that he could be convicted under the indictment preferred. In a certain sense appellant if he was an accomplice would be connected with James Fox in the killing, but not being present nor acting as a principal, he could not be convicted under this indictment. This language of the charge authorized the jury to convict whether appellant was present or not, and solely upon the ground that he may have been connected in some way with Fox. The evidence excludes the fact that appellant did the killing. Fox did it; the evidence shows that he did, and the State proved this by Fox's statement, and is bound by that statement unless disproved. The statement of Fox to the effect that he did the killing, introduced by the State, bound the State so far as the force and cogency of Fox's statement would indicate. There were but two shots fired, and it is proved conclusively that Fox fired those two shots. This but intensifies the proposition that a charge on accomplice testimony should have been given.

We deem it unnecessary to discuss the weight and effect of the statements and confessions and admission of Fox introduced by the State. It is sufficient for this opinion that the State having placed this confession or statement of Fox before the jury, was bound by it

unless disproved, and it became incumbent upon the State, before a conviction could be had, to show in some way that appellant aided or assisted Fox as a principal and the jury should have been appropriately so charged. The State having put in Fox's confession that he did the killing, and failed to show appellant's presence, under this indictment he should have been acquitted. This has been the rule in Texas under all the authorities since Pharr v. State, 7 Texas Crim. App., 472. See also Pratt v. State, 53 Texas Crim. Rep., 281; Pratt v. State, 50 Texas Crim. Rep., 227; Combes v. State, 52 Texas Crim. Rep., 617; Gibson v. State, 53 Texas Crim. Rep., 360; McKinney v. State, 48 Texas Crim. Rep., 404; Jones v. State, 29 Texas Crim. App., 20. We think enough has been said with reference to the condition of the case viewed from the standpoint of the charges, without further elaboration.

A bill of exceptions shows substantially as follows, that the State, on cross-examination of Mrs. Fox, wife of James Fox, asked her if she had not called up Ted Robinson at Captain Jackson's cotton office over the telephone at night-time. To this she replied she had not. The court, over several objections of appellant, permitted the witness Miss McSpadden to testify that Mrs. Fox did have a conversation over the telephone with Ted Robinson and had at night-time asked Ted Robinson to come to her house, stating that her husband was absent, and the statement of facts is referred to to more fully disclose the evidence in this connection. This evidence was inadmissible. It is a little difficult to see what connection the conduct between Mrs. Fox and Ted Robinson had with the defendant's case. One of the theories of the State was that appellant had been intimate with Mrs. Fox, but what connection the intimacy, if any existed, between Ted Robinson and Mrs. Fox had to do with defendant's case, is not made to appear. It was an attack upon her reputation for chastity if it occurred, but it did not connect the defendant with it. It was hearsay as to defendant and not authorized.

Another bill recites that a conversation occurred between Fox and the witness Zarafonetis in the city of Fort Worth, about sixty miles from Hillsboro, the scene of the homicide, in which Fox told the witness to tell the defendant Menefee to write to him all about it, and told the witness to be sure and telephone Menefee about the message as soon as the witness should reach Hillsboro. This witness testified as follows: "He told me he wanted to hear on the first train. I told him I would go to Hillsboro about 11 o'clock and it would be too late for Dr. Menefee to write him and he said it did not make any difference what time I got there, to phone Dr. Menefee and tell him he expected a letter by the first train. I told him the first train left at 5:30 and he would not have time to write a letter and he said he expected a letter tomorrow any way from him and I left him. He told me as soon as I got to Hillsboro to phone Dr. Menefee and tell him to write him a letter all about it. He did not say what about, said he

was anxious to get a letter from Dr. Menefee." Without going further into the details of this bill of exceptions, and its connection with the case, it is sufficient to say this evidence was inadmissible, for this bill recites the witness never communicated with Dr. Menefee, and it was, therefore, matters occurring between the witness and Fox of which appellant was ignorant.

Another bill recites that the witness Odell was used by the State as a witness, and was asked about matters about which appellant consulted him as an attorney and about which the witness gave him advice, the witness himself testifying that he understood the relations between attorney and client existing in regard to the matter. We do not care to go into this matter further than to say this bill is well taken. An attorney can not be questioned about matters about which he advised his client; they are confidential communications and are exempt by statute.

Another bill recites that the State relied for a conviction upon circumstantial evidence, and defendant interposed the defense of alibi, and the testimony of Mrs. Menefee, which is correctly reported in the statement of facts, and the testimony of Mrs. Strudivant, also reported in the statement of facts, and of Mrs. Cobb also reported in the statement of facts, tended to support this alibi. The evidence showed immediately after the homicide Fox walked to the sheriff's office and telephoned the sheriff and surrendered to him, and told him that he had killed Frank Glasgow, and delivered his shotgun to him, both barrels of which were shown to have been freshly fired. The State then placed Fannie Fryer on the stand during its case in chief and proved and developed the things which are reported in this bill. It is further recited defendant had offered no evidence concerning the matters complained of in the bill, but same were developed by the State in chief during the examination of the witness. This bill is a very lengthy one, and recites, in substance, that the witness had attended as nurse a woman by the name of Hunton who had given birth to a child; that the woman had been also attended by the defendant as physician; that after the child was born it was put by defendant in a washstand, and on his return the child made a noise and that defendant gave it medicine when the child died, and the defendant carried it off, and that that defendant suggested to the mother of the witness that the child be burned, and that she had testified before the grand jury, and that she had been brought to the courthouse by Frank Glasgow and that she had told the defendant that Frank Glasgow has brought her to the courthouse, all of which more fully appears by her testimony, which was objected to by the defendant upon various grounds hereinafter set out. It is unnecessary to give details of this bill. It is very lengthy. It covers a great many pages in the record, going into all the details known to this witness in regard to the woman Hunton, her going to Hillsboro, being delivered of the child, and all the acts

and circumstances and conversations occurring between the parties, and the propositions made by defendant rejected by them in regard to this whole transaction. This evidence was, we presume, offered and admitted on the theory that appellant had ill will towards Glasgow for his attempted prosecution in regard to this matter. The fact that Glasgow had undertaken to prosecute appellant in regard to this matter may have been admissible to show motive and ill will on the part of the defendant towards Glasgow, the deceased, but as to all the details in regard to the birth of the child and the acts of the parties, same would not be admissible. The details of the testimony of this witness were gone into practically as if they were trying appellant for infanticide or abortion or some criminal case growing out of the confinement of the woman Hunton and the death of the child instead of trying appellant for the homicide of Glasgow. This character of examination is not permissible. It placed defendant before the jury in the attitude of being prosecuted for whatever offense there might be growing out of the transaction with the woman Hunton. This, of course, would justify and authorize the defendant to go into all the defensive side of the matter and meet all of the testimony of this kind as best he could from the standpoint of that issue. The rule we understand to be well settled, that the details of extraneous crimes or supposed extraneous crimes will not be permitted even to show motive. The fact that an accused may have ill will towards a deceased can be shown, but the details of the extraneous crime would not be permitted to go before the jury. It would involve the trial of the extraneous crime.

There are other bills of exception along the same line of thought where the State was permitted to go into many extraneous matters, not only the fact that these matters existed but into all details and circumstances at great length. What has been said in regard to the above bills may be said generally of these bills. The examination of the witnesses and introduction of testimony took the widest possible range, and introduced a great many things, details and circumstances that ought not to have been in the case. Upon another trial the State may be permitted to prove facts that show motive on the par of appellant against deceased where it connects with deceased as operating upon the mind of appellant any ill will or supposed ill feeling or animosity that he may have cherished, otherwise the testimony would not be admissible, and even the details of those other matters are not permissible. We make these few general remarks, and the trial court will understand, without going into a discussion of the great number of bills reserved, amounting to forty-five in number.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*

ON REHEARING.

June 26, 1912.

DAVIDSON, PRESIDING JUDGE.—At a previous day of the term the

judgment herein was reversed and the cause remanded for reasons set forth in the original opinion. The State has filed a motion for re-hearing in which it is contended the court was in error in directing that upon another trial if the facts were the same as upon this trial, and appellant filed his motion for change of venue, it should be granted. We have reviewed the matter in the light of the zealous contention of counsel for the State, but see no reason for changing the views expressed. We deemed it then unnecessary and still deem it unnec-cessary to go into a discussion of the question. If a motion to change the venue should be made upon another trial, the facts may be dif-ferent, conditions may be different, or they may be the same, and it is, therefore, unnecessary to discuss those matters in the light of a required reversal upon other questions.

It is also insisted the court erred in holding that appellant proved by several witnesses he was at home in bed at the time of the homi-cide and had no connection with the killing, and that this finding of the court is not supported by the record. It is stated also in the mo-tion that no witness except appellant's wife testified that he was at home in bed at the time of the homicide. Upon that question the rec-ord discloses that Mrs. Menefee testified: "It was about 11:30 o'clock that he went to bed. Dr. Menefee did not leave the house that night at any time after that. He slept in the bed with me that night. Dur-ing that night the telephone rang two or three times, or maybe more, but I remember that it rang several times." Mrs. Sturdivant testified as did Mrs. Cobb that during the night on different occasions appellant was called over the telephone in response to inquiries touching his pro-fessional services in their families. This covered the very time when the State was contending that he was lying in wait for the deceased. Whatever counsel or the court may say with reference to this testimony, the alibi testified by these witnesses covers the time when the State was relying upon his presence at another and different place, to wit, the place of the homicide.

It is also contended that the court erred in holding that it is a "conceded fact" that there were but two shots fired, because the record contains evidence tending to show that there were three shots fired, and various and sundry circumstances were proved bearing upon that issue such as gun-wadding directly in line between the dead body and the corner of the church from where the State contends appellant fired the shot into the back of deceased's head, and other matters of that sort. Perhaps the expression "conceded fact" may have been a little strong, though the writer does not think so. With reference to this question Marvin Sanders, a State's witness, testified "about the time it is said Frank Glasgow was killed I heard two shots right close together, just about like you would snap your fingers. I would esti-mate that I was about 125 feet from the church. These two shots I heard were just like a man shooting a double barrel shotgun." John White testified as follows: "My house is situated on the east side of

Church Street and directly south and the second building from the Presbyterian church. I was at home that night. Sometime during the latter portion of the night I was awakened by the report of two guns in rapid succession. Those shots were as near together as they could be to be distinguishable from each other. So far as I could say there was no difference in the sound of those reports." W. F. Garrett testified that he lived at 107 South Church Street, which is the Alton hotel; that is the first house south of the Presbyterian church. "I remember the night Frank Glasgow is said to have been killed. I was at home that night. I was sleeping in the east room down stairs. I heard two shots fired that night. They were very close together, about like that (snapping his fingers). I was awake at the time." H. M. Slaughter testified as follows: "What I thought I heard at the time was two gun shots in quick succession. · Just about like that (snapping his fingers). Very close together. The first one followed the second one before the noise of the ,first had gone away. I was awake at the time, and in the Sanders boarding house. Sanders boarding house is a little southwest of the Presbyterian church and is something like 175 feet away, or maybe a little farther." The same witness being examined by the court testified: "Those shots I heard just seemed like a dead noise to me, and it sort of cleared up and the sound got off, is the best I could tell about. It sounded to me like two shots but it was so close together it sounded like all the same noise." Being crossed, this witness testified: "To the best of my judgment it sounded like two shots. I did say, in answer to you at first, that the best I could make out there was two explosions, and that is my statement now, that it sounded to me like right close together about like you would snap your fingers." Will Farmer testified on the morning Glasgow was killed, "I was at my bakery. My bakery is on Franklin Street, and Mr. Glasgow was killed at the church on Elm and Church Streets. I could not say hardly how far my bakery is from the church. It is about a block though. At the time that Mr. Glosgow was killed I was standing in the back door of my bakery. The back door of the bakery is located on this alley back of Grahams' store, about half way between Franklin and Elm Streets. What attracted my attention was that I heard a loud explosion, at least I took it to be an explosion, and I thought it was a safe blown open or something like that in Martin-Bragg's dry goods store. The Martin-Bragg dry goods store is between me and the, place where Frank Glasgow was killed. There is a row of building all along on both sides of Franklin and Elm Streets. Most of those stores on Elm Street are two stories high. That whole block is built up with brick buildings. They are all between me and the church." Chas. Rader testified: "About 3 or 3:30 o'clock that morning I heard the report of a gun. I couldn't tell whether it was one or two reports. I was about half asleep and it woke me up." "My restaurant is on the· south side of the square on Elm Street." "I remember the time Frank Glasgow lost his life. That morning I was

over at the restaurant." It may be stated that the restaurant is situ-
ated about two blocks from the church in the business portion of the
city on the same side with the church. The church is the scene of the
homicide.

This, as far as the writer ascertains from the statement of facts, is
the evidence in regard to the number of shots fired. The State also
placed in evidence the statement of Jim Fox made to Sheriff Freeland
that he had shot Glasgow, at the same time handing the sheriff his
double barrel shotgun, both barrels of which showed to have been re-
cently fired. There were two shells found at the scene of the homicide.
It also appears from the record that Fox had bought seven shells con-
taining BB shot from one of the witnesses who testified in the case.
and when he surrendered the gun he also surrendered five shells con-
taining BB shot, being the same shells that he bought from the wit-
ness. The two shells found at the place of the homicide were of the
same character of shell, and the wadding found on the ground came
out of the BB shells. Perhaps it would have been better to have said
it was a "proved fact" instead of a "conceded fact" criticised by the
State's motion for rehearing. That is a small matter, however, to dis-
cuss in this opinion. There can be no question under this record that
there were but two shots fired and that Fox fired those two shots. In
this connection it may also be stated that appellant did not own a
shotgun. This was shown by the evidence of his family who testified
on the trial, and it was also shown by the witness that appellant owned
none, and was in the habit of renting guns when he went hunting.
And no witness showed that appellant had rented a gun, or had in his
possession a gun at the time, or that he had purchased any shells, or
had any shells, and his wife and children testified that he did not have
any. While it is but a deduction from the facts, it might be sug-
gested that if Fox had a gun and appellant had a gun, and they al-
ready had shells, it would be a little strange that Fox would wake up
a man at midnight in order to make a purchase of shells. The writer
is still of the opinion that it is a proved, even an undisputed fact in
this record, that there were but two shots fired, and the evidence shows
that Jim Fox fired both shots.

It is contended that the court was in error in holding that the evi-
dence of the witness Odell should have been excluded on the ground
that it was privileged communication. The original opinion so held.
This quotation is made from the testimony of the witness Odell: "I
am a lawyer, and understand my business here to be professional, or I
should not have been here. I understand the object of Dr. Menefee
seeking an interview in regard to professional matters. At the time I
was discussing these matters I was doing it from the standpoint of a
lawyer in giving him the best advice I could." It might be further
stated that Mr. Odell had this conference with Dr. Menefee at Mene-
fee's suggestion as his attorney in regard to a certain matter, and, as
Mr. Odell says, he would not have been present conferring with Dr.

Menefee except he understood he was being professionally called in consultation by Dr. Menefee.

The original opinion is also criticised with reference to the holding therein that the law on murder in the second degree should have been charged. With all due deference to the able counsel who represent the State, and for whose fairness and accuracy of judgment the writer entertains the highest regard, still we can not agree with them in this proposition. The evidence so far as appellant is concerned is entirely circumstantial. The circumstances attending the meeting even of Fox and deceased are not shown, what transpired at the time of the killing is unproved, outside of the killing, the place of the killing, and the hour of the night at which the killing occurred. It is evident from the facts in this record that Fox killed deceased on account of what deceased had said and done in reference to his, Fox's wife. Just what occurred between the parties at the time this record leaves in absolute darkness and obscurity; what may have been said between them, how Fox came to kill, whether it was after a demand from him to retract what he said, and a reiteration of what he had said and done; in fact, nothing is shown as to the meeting except as before stated, it was early in the morning about 3:30 to 4 o'clock. Whether Fox was following the advice of appellant to leave the town and go away and secure employment, and was en route to the depot is not shown, and that if he was the meeting was purely accidental; but the State assumed as an uncontroverted fact that Fox and appellant were together and laying in wait for Glasgow to come along at that particular point for the purpose of taking his life. The evidence is not as conclusive as the State would seem to think. It was known to appellant and Fox that Glasgow was an officer and on duty about the time, and that duty called him in and about the city limits during the night. Had they been hunting him for the purpose of killing him it was not necessary for them to wait at this particular point, especially in view of the evidence which tends to show that there was a different route that deceased at times followed in going home, and perhaps a shorter and more practical route; at least there was another route by which he did or could go home, and had they been waiting they perhaps would have gone to the point from which deceased would diverge in going one way or the other. But, however this may be, the facts are not conclusive nor certain, but they are left in doubt and mystery; the immediate facts are unknown and unproved. All assumption and presumption, when it comes to submitting issues of fact to the jury in the charge, must be favorably given in behalf of the accused. We deemed it unnecessary to cite the cases in the original opinion, and still deem it unnecessary. We cited Mr. Branch's Criminal Law in the previous opinion where the authorities are collated. The question is one so thoroughly settled that it is deemed unnecessary to cite the cases.

Another question with reference to the charge is this: The State seems to be of the impression that the evidence excludes every other

theory except that appellant was present and a principal in the transaction of the killing, and that the killing was murder in the first degree. The evidence that way is far from certain and conclusive. Of course, if appellant was present, and he and Fox remained there at that church until three or four o'clock in the morning, and then deliberately shot and killed Glasgow, it would be murder in the first degree; but the evidence must make that so apparent that all other issues favorable to the defendant must be excluded. It would be but speculation to assume that the State's theory is correct. Appellant is not shown to be present by any positive evidence, and as we understand this record the State did not have any evidence before it to prove his presence closer than 12 or 12:30 o'clock at night through the mouth of the witness Sanders. He thought he recognized appellant near the church where the homicide occurred about 12 or 12:30 o'clock, and he then recognized him he says only by means of a match lighted and used in lighting a cigarette at something like 175 to 200 feet. The writer would suggest that it would be a little difficult to recognize a man at that distance at night by means of a lighted match. But it is unnecessary to discuss that as under any possible construction of the evidence, taking the time that Sanders saw appellant at 12:30 and the time of the homicide at 3:30 to 4 a. m., there were three hours' or more time with witnesses passing the scene of the homicide in the meantime without discovering the presence of anybody. This court nor should the trial court assume as conclusive under this state of case the presence of appellant at the scene of the homicide. If he was not present and had advised Fox to do the killing, and had furnished him the means, or had done other things that led Fox to do the killing, it might have brought him within the rule of being an accomplice, provided the facts were sufficiently cogent, yet it did not make him a principal.

It is also insisted that the court should not have sustained some of the objections of appellant to the introduction of evidence. What was said in the original opinion, we think, was correct. These matters we deem unnecessary to review. The State had the right to introduce evidence which showed motive, ill will, hatred and any of those matters which would tend to show a reason why appellant was engaged in the killing, but that would not be sufficient to show his presence, and while these matters of motive may be introduced legally and correctly, yet it is not permissible to go into all the details between other parties in connection with those transactions with which appellant was not connected. The rule, we think, is well established that on trial of the main case an investigation into collateral cases, all their details and circumstances, will not be permitted. There must be a line drawn somewhere, otherwise the main case would be diverted from trying the main issue charged in the indictment to other collateral matters not included in the case otherwise than incidental.

We do not care to review these matters again. We appreciate and

commend the zeal of attorneys in the presentation of their side of the case, but this court is presumed not to enter into those matters, but to as fairly and impartially decide the issues involved as is possible for a court to do, and to hold as best we can the scales of justice in equipoise and yet firmly and legally. There is nothing in this record or in the motion for rehearing, in our judgment, which would justify the affirmance of this case, and the motion for rehearing does not contain sufficient matter, in our judgment, to justify us in setting aside the previous judgment of reversal.

The motion for rehearing is overruled.

*Overruled.*