**David Owen BROOKS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 56288.**

Court of Criminal Appeals of Texas, Panel No. 3.

May 16, 1979.

Elaine Brady and Jim Skelton, Houston, for appellant.

Carol S. Vance, Dist. Atty., James C. Brough and Donald Lambright, Asst. Dist. Attys., Houston, and Robert Huttash, State's Atty., Austin, for the State.

Before DALLY, W. C. DAVIS and CLINTON, JJ.

## OPINION

DALLY, Judge.

This is an appeal from a conviction for murder with malice under the former penal code. Art. 1256, V.A.P.C. (1925). Punishment was assessed at imprisonment for life.

Appellant contends that the evidence is insufficient to support the conviction, the law of principals was erroneously submitted to the jury, extraneous offenses were unlawfully admitted in evidence, the admonitory charge concerning the extraneous offenses was improper, an oral confession was admitted in violation of Art. 38.22, V.A.C. C.P., a charge on circumstantial evidence should not have been submitted to the jury, and the trial court erroneously refused appellant's requested charge on the law of accessories.

The indictment alleges that on or about July 10, 1973, appellant

". . . unlawfully with malice aforethought kill[ed] William Ray Lawrence by strangling him with a cord and in some manner and by some means, instruments, and weapons to the Grand Jury unknown."

In its charge, the trial court instructed the jury on the law of principals in the following manner:

"All persons are principals who are guilty of acting together in the commission of an offense. When an offense is actually committed by one or more persons, but others are present and, knowing the unlawful intent, aid by acts or encourage by words those actually engaged in the commission of the unlawful act, such persons so aiding or encouraging are principals and may be prosecuted as such. Mere presence alone will not constitute one a principal.

"Therefore, if you find from the evidence beyond a reasonable doubt that Dean Corll and Elmer Wayne Henley, Jr., or either of them, in Harris County, Texas, on or about the 10th day of July A.D. 1973, did then and there unlawfully with malice aforethought kill William Ray Lawrence by strangling him with a cord

and in some manner and by some means, instruments, and weapons unknown, if you do so find, and that the defendant, David Owen Brooks, was then and there present at the time and place of the killing and knew of the intent, if any, of said Dean Corll and Elmer Wayne Henley, Jr., or either of them, to kill the said William Ray Lawrence and encouraged by words or aided by acts the said Dean Corll and Elmer Wayne Henley, Jr., or either of them, in the commission of said act, then you will find the defendant, David Owen Brooks, guilty of murder with malice aforethought as charged in the indictment.

"Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant.

"You are further instructed that Defendant's knowledge of the crime coupled with his mere presence at the scene of the killing, if any, would not constitute him a principal, and if you should find from the evidence beyond a reasonable doubt that Dean Corll and Elmer Wayne Henley, Jr., or either of them, did then and there voluntarily kill the said William Ray Lawrence, as aforesaid by strangling him with a cord and in some manner and by some means, instruments, and weapons unknown, but you further find and believe from the evidence, or have a reasonable doubt thereof, that the defendant, David Owen Brooks, did not aid by acts or encourage by words the said Dean Corll and Elmer Wayne Henley, Jr., or either of them, in the commission of said killing then you will find the defendant, David Owen Brooks, not guilty."

William Ray Lawrence, who was fifteen years old, was last seen alive by his father, James Lawrence, on June 4, 1973. That night, William called his father and told him that he was going fishing with friends, whom he would not name, and would return later in the week. On June 11, 1973, James Lawrence received a letter from his son postmarked June 8, in which William indicated that he was seeking employment in Austin and would return later that summer.

The nude body of the deceased was found buried near Lake Sam Rayburn on August 9, 1973. The body was wrapped in plastic sheeting and covered with lime. Dr. Jack Pruitt, a pathologist, testified that the cause of death was strangulation by means of the cord found tied around the neck of the body.

Detective Jim Tucker testified that he took an oral statement from appellant on the morning of August 9, 1973. On August 8, Elmer Wayne Henley, Jr., had shot and killed Dean Corll in Pasadena and had subsequently led police officers to a boat house in Houston where eight bodies had been found buried. In his statement, appellant told Tucker that Corll had told him that he, Corll, had killed two boys and buried them at the boat house. Appellant also told Tucker of his discovery, during a visit to Corll's apartment, of two nude boys tied to Corll's bed. Finally, appellant told Tucker that he had met Corll when he was in the sixth grade (appellant was eighteen at the time he gave the statement), that Corll had engaged in homosexual activities with many boys, including appellant, that he had introduced Henley to Corll, and that he had lived with Corll intermittently. In this statement to Tucker, appellant said nothing to indicate that he had been present at any murders committed by Corll or Henley.

On August 10, 1973, appellant executed two written confessions, both of which were admitted in evidence. The first reads, in pertinent part:

"I came to the police station on August 9th in order to make a witness statement about what I know about Dean Corll. I came down of my own free will and I gave that statement to Det. Tucker. In the statement what I said was partially the truth but I left out the fact that I was present when most of the killings happened . . . I was in the room when they happened and was supposed to help if something went wrong.

"The first killing that I remember happened when Dean was living at the Yorktown Townhouses. There were two boys

there and I left before they were killed but Dean told me that he had killed them afterwards. I don't know where they were buried or what their names were. The first few that Dean killed were supposed to have been sent off somewhere in California.

"The first killing that I remember being present at was on 6363 San Felipe. That boy was Ruben Haney. Dean and I were the only people involved in that one but Dean did the killing and I just was present when it happened.

"I also remember two boys who were killed at the Place One Apartments on Mangum. They were brothers and their father worked next door where they were building some more apartments. I was present when Dean killed them by strangling them but again I didn't participate. I believe that I was present when they were buried but I don't remember where they were buried. The youngest of these two boys is the youngest that was killed I think.

\*     \*     \*     \*     \*     \*

"A boy by the name of Glass was . . killed at the Columbia address. I had taken him home one time but he wouldn't get out because he wanted to go back to Dean's. I took him back and Dean ended up killing him. Now that I think about it I'm not sure whether it was Glass that I took home or another boy, but I believe it was Glass.

"It was during the time that we were living on Columbia that Wayne Henley got involved. Wayne took part in getting the boys at first and then later he took an active part in the killings . . . Most of the killings that occurred after Wayne came into the picture involved all three of us.

\*     \*     \*     \*     \*     \*

"There was another boy killed at the Schuller house, actually they were two at this time. A boy named Billy Balsch and one named Johnny and I think that his last name was Malone. Wayne strangled Billy and he said 'Hey Johnny' and when Johnny looked up Wayne shot him in the forehead with a .25 automatic. The bullet came out of his ear and he raised up and about three minutes later he said, 'Wayne please don't'. Then Wayne strangled him, and Dean helped.

\*     \*     \*     \*     \*     \*

"Dean moved to the Frencesa Apartments on Wirt  .  .  .  At that time I was using Dean's car so I was in and out all of the time.

"After the Frencesa apartments Dean moved to Pasadena. I know of two that were killed there. One was from Baton Rouge and one was a small blond boy from South Houston. I saw the boy from South Houston for about 45 minutes. I took him a pizza and then I left and he wanted me to come back. I wasn't there when either of these boys were killed. I did come in just after Dean had killed the boy from Baton Rouge, that was on a different day from the blond boy.

"In all I guess there were between 25 and thirty boys killed and they were buried in three different places. I was present and helped bury many of them but not all of them. Most of them were buried at the boat stall. There were three or four buried at Sam Rayburn, I think, I am sure that there are two up there. On the first one at Sam Rayburn I helped bury them, and then the next one we took to Sam Rayburn when he got there Dean and Wayne found that the first one had come to the surface and either a foot or a hand was above the ground. When they buried this one the second time they put some type of rock sheet on top of him to keep him down.

"The third place that they were buried was on the beach at High Island. This was right off of the Winnie Exit, where that road goes to the beach. You turn east on the beach road and go till the pavement changes, which is about a quarter or half of a mile and the bodies are on the right hand side of the highway about 15 or 20 yards off of the road. I never actually buried one here but I always drove the car. I know that one of the graves had a large rock on top of it. I

think that there were 5 or more bodies buried at this location. The bodies at the beach are in a row down the beach for perhaps a half a mile or so. I am willing to show officers where this location is and will try to locate as many of the graves as possible." [1]

The second confession reads, in pertinent part:

".  .  . I want to give this statement about Billy Ray Lawrence.

"About July 10th, 1973, I tried to call Dean's house, Dean Corll, and it was a long time before I could get him or anyone to answer. Finally, Wayne answered and I asked him if they had anyone there and he said yes. I asked him 'It's not a friend, is it?' and he said 'sort of'. He wouldn't tell me who it was so I went over there just to see who it was. He was still alive when I got there but he was tied to the bed. I recognized him only as a friend of Wayne's.

"The boy wasn't doing anything but lying there when I got there. He didn't have any clothes on. I don't remember them calling him by name but I have just now been shown a picture of him which I will initial with this date and time and it is the same boy I have been talking about. In fact, I have seen this same picture before at Dean's house.

"I was tired so I went to bed in the opposite bedroom. Before I did go to bed I took Wayne home. Then I went back to Dean's house and went to bed. The boy was still alive but Dean was awake because I remember he let me in. The next morning I went back to get Wayne and Dean was supposed to pay me $10.00 for doing this but he never did. That is, the $10.00 was for taking Wayne home the night before.

"I'm not sure about the time but I think it was the next evening when Wayne's mother called. She was drunk and insisting Wayne come home but he told her no, that he was going to the lake for a couple of days. The boy was still alive. We left about 6:00 p. m. to go to the lake and I know he was dead and in a box when we left so I must have been there when he was killed because I didn't leave to go anywhere before we left for the lake. [However, I do not remember how he was killed. I don't know if I saw it or not.] It didn't bother me to see it. I saw it done many times. [I just wouldn't do it myself. And I never did do it myself.]

"We left for the lake about 6:00 p. m., and got there about 9:30 or quarter to ten. We then went fishing. Wayne and me. This was after we slept. We fished from about 6:30 A.M. to 10:00 A.M. Dean told us he had already picked a spot and started digging, but he actually hadn't done very much.

"When Wayne and I got back from fishing, we ate and I went to sleep. I slept until about 5:00 p. m. and then Dean and I dug the grave. Wayne was keeping lookout in the van. The spot was by a trench near a dirt road. It was probably a few miles from Lake Sam Rayburn itself.

"We took the body out of the box, that is, Dean did, and I held the boy's feet about half way to the grave. The body was already wrapped in plastic. I went back to the van to get the carpet and a flashlight. The carpet is to shovel extra dirt on and take it some place else so there wouldn't be a mound showing.

"I almost took too much dirt off and Dean griped at me for it." [2]

The photograph referred to in the second confession was admitted in evidence. It was found by police in Corll's bedroom and identified at the trial by James Lawrence as a photograph of his son, the deceased.

In his first confession, appellant specifically refers to eight murders with which he was familiar: Ruben Haney, two brothers killed at the Place One Apartments, a boy named Glass, Billy Balch, Johnny Malone, a

---

1. The deleted passages were not offered in evidence by either the State or appellant.

2. The bracketed passages were not offered in evidence by the State, but were subsequently offered by appellant.

boy from Baton Rouge, and a small blond boy from South Houston. Except for the last two, appellant admitted being present when each of these murders was committed. What follows is a brief summary of the further evidence concerning these murders offered by the State and admitted at the trial.

The body of Ruben Haney, nineteen, was found buried in a Houston boat house rented by Dean Corll; the cause of death was strangulation. Haney's mother testified that her last conversation with her son was a telephone call in which he told her he was going to spend the night with appellant.

The bodies of Donald and Jerry Waldrop, thirteen and fifteen, were found buried in the boat house; the cause of death in each case was strangulation.

The body of James Glass was found buried in the boat house; the cause of death was strangulation.

The body of Billy Balch, seventeen, was found buried on the beach near High Island; the cause of death was strangulation.

The body of Johnny Delone, eighteen, was found buried at High Island; the cause of death was strangulation and a .25 caliber gunshot.

The body of Stanley Blackburn, twenty, from Baton Rouge, Louisiana, was found buried near Lake Sam Rayburn; the cause of death was strangulation. Blackburn's Louisiana driver's license was found in Corll's house and identified at the trial by his mother.

The body of James Dreymala, thirteen, was found buried at the boat house; the cause of death was strangulation. A bicycle registered to Dreymala and identified at the trial by his father was also found in the boat house. Dreymala's father testified that his son had blond hair, and at the time of his disappearance the family lived in South Houston.

In each case, the body was nude, wrapped in plastic sheeting, and covered with lime. In most cases, the cord used to strangle the victim was still tied around the neck of the body.

In addition to this testimony, several police officers described in general terms the search for and recovery of bodies at the three burial sites. Although there was no testimony concerning the identity or cause of death of any other victims, all were young males and had been buried in a similar manner.

■ Under the law of principals set forth in Arts. 65–69, V.A.P.C. (1925), in effect when the charged offenses were committed, there are six different fact situations in which one may be guilty as a principal to a felony offense. They are:

(1) When A. actually commits the offense, but B. is present, knowing the unlawful intent, and aids by acts or encourages by words.

(2) When A. actually commits the offense, but B. keeps watch, so as to prevent the interruption of A.

(3) When A. is actually executing the unlawful act, and B. engages in procuring aid, arms, or means of any kind to assist while A. executes said unlawful act.

(4) When A. actually commits the offense but B., at the time of such commission, is endeavoring to secure the safety or concealment of A., or of A. and B.

(5) When A. employs an innocent agent, or by indirect means causes the injury, or brings about the commission of the offense.

(6) When A. advises or agrees to the commission of the offense, and is present when the same is committed, whether he aid or not.

*Jones v. State,* 505 S.W.2d 903 (Tex.Cr.App. 1974); *Robinson v. State,* 493 S.W.2d 780 (Tex.Cr.App.1973); *Middleton v. State,* 86 Tex.Cr.R. 307, 217 S.W. 1046 (1919). In every case, the evidence must show that at the time of the commission of the offense the parties were acting together, each doing some part of the execution of the common purpose. *Robinson v. State,* supra; *Middleton v. State,* supra.

In *Harrington v. State,* 547 S.W.2d 621 (Tex.Cr.App.1977), this Court stated:

"To determine whether an accused was acting as a principal, the trial court may look to events before, during and after the commission of the offense. *Bush v. State*, 506 S.W.2d 603 (Tex.Cr.App.1974). While mere presence during the commission of an offense will not make a person a principal, it is a circumstance tending to prove that a person is a principal. *Coronado v. State*, 508 S.W.2d 373 (Tex.Cr.App.1974). 'An agreement of partners to act together in a common design can seldom be proven by words, but reliance can often be had on the actions of the parties showing an understanding and common design to do a certain act.' *Everett v. State*, 153 Tex.Cr.R. 79, 216 S.W.2d 281 (1949)."

Appellant's confessions and the other evidence introduced by the State clearly establish an understanding and common design on the part of Corll, Henley, and appellant involving the murder of teenaged boys. In his first confession, appellant states that he was present when most of the killings committed by Corll and Henley took place, and that he was supposed to help if something went wrong. In this confession, appellant refers to several murders at which he was present and which occurred prior to the murder of William Lawrence. The State introduced evidence showing that these murders were similar to that of Lawrence in terms of the age of the victim, the cause of death, and the manner in which the body was buried.

■ In his second confession, appellant admitted being present when William Lawrence was killed. From this, and from his description of his role in the burial of the body, the jury could reasonably infer that appellant, knowing the unlawful intent of Corll and Henley, had been present when William Lawrence was murdered and prepared, as he had been in the prior murders, to provide assistance to Corll and Henley if something went wrong. Such conduct falls within the first, second, fourth and sixth fact situations set forth in *Jones v. State*, supra. We hold that the trial court acted properly in charging the jury on the law of

principals and that the circumstantial evidence is sufficient to support appellant's conviction as a principal to the murder of the deceased.

Contrary to appellant's contention, the statement in the second confession that ". . . I went over there just to see who it was . . ." is not an exculpatory statement which would prohibit a finding of guilt. Even if the statement is accepted as true, it does no more than explain why appellant went to Corll's house. The statement is not inconsistent with a finding that appellant was a principal to the murder of the deceased. See *Richards v. State*, 511 S.W.2d 5 (Tex.Cr.App.1974).

Appellant contends that the trial court failed to apply the law of principals to the facts of the case. He also contends that the charge on the law of principals comments on the weight of the evidence because it instructs, without qualification, that Corll and Henley killed the deceased while appellant was present. A reading of the court's charge on the law of principals, previously quoted, discloses that both of these contentions are factually incorrect; no further discussion is necessary.

Appellant contends that the trial court erred by permitting the introduction of evidence of his homosexual activities with Corll and of murders other than that of the deceased. He contends that this was evidence of extraneous offenses and therefore inadmissible.

■ The general rule against admitting evidence of other crimes by the accused is inapplicable if such evidence logically tends to show his guilt of the offense charged. In other words, relevant evidence that tends to prove that the accused committed the crime charged is not inadmissible simply because it may also reveal that he has committed other crimes. *McDonald v. State*, 513 S.W.2d 44 (Tex.Cr.App.1974); *Johnston v. State*, 418 S.W.2d 522 (Tex.Cr.App.1967). Among other things, evidence of extraneous offenses by the accused has been held admissible to prove scienter, where intent or guilty knowledge is an essential element of the State's case and cannot be inferred

from the act itself, and to show the accused's motive, particularly where the charged offense is part of a continuing plan or scheme. *Albrecht v. State*, 486 S.W.2d 97 (Tex.Cr.App.1972).

■ Evidence that appellant knew of and had been present during other murders by Corll and Henley, had been prepared to help if something went wrong, and had assisted in the burial of these other victims was admissible to prove that appellant was aware of Corll's and Henley's intent to murder the deceased, an essential element of the State's case. Moreover, this evidence, together with appellant's confession that he had been present when the murder of the deceased took place and had assisted in the burial, was admissible to prove that appellant had aided and encouraged Corll and Henley in the commission of the murder, another essential element of the State's case. Finally, evidence of the other murders and of appellant's long-standing relationship with Corll and Henley was admissible to show that the murder of the deceased was part of a continuing scheme on the part of Corll, Henley, and appellant, and was evidence of appellant's motive in remaining at Corll's house on the days in question.

The trial court gave the following charge on extraneous offenses:

"You are further instructed that if there is any testimony before you in this case regarding the defendant's having committed offenses other than the offense alleged against him in the indictment, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offense or offenses, if any were committed, and even then you may not consider the same unless you find and believe beyond a reasonable doubt that there is such a concurrence of common features between the several crimes in which the defendant was involved as a principal, as hereinbefore defined, as will show logically that all of them might well have resulted from a common plan or systematic course of action. If you do so believe beyond a reasonable doubt, you may only consider the same in determining the motive, or intent, if it does, in connection with the offense, if any, alleged against him in the indictment, and for no other purpose."

■ Appellant contends that the trial court erred in submitting this charge over his objection because it does not apply the law to the facts of the case. Appellant cites no pertinent authority for this contention. The charge given by the trial court is similar to that regularly given by the courts of this State. See Morrison and Blackwell, Willson's Texas Criminal Forms Annotated, Sec. 88.05 (8th ed., 1977); McClung, Jury Charges for Texas Criminal Practice, p. 248 (rev.ed., 1979). The charge applies the law to the facts of the case to the extent it is possible to do so without commenting on the weight of the evidence. This ground of error is overruled.

Appellant contends that the statement he gave to Detective Tucker on August 9, and Tucker's trial testimony based thereon, was inadmissible under Art. 38.22, V.A.C.C.P. In order to evaluate this contention, we must examine the circumstances in which the statement was made.

The evidence establishes that appellant, his father, and his uncle went to the office of Lieutenant J. D. Belcher of the Houston police on the morning of August 9. News reports concerning the shooting of Corll by Henley, and of the subsequent discovery of bodies at the boat house, had begun during the previous day. Appellant told Belcher, who was a friend of his uncle, that he had information concerning Henley. Belcher contacted the homicide division, and Tucker was assigned the task of taking a witness statement from appellant.

It is undisputed that appellant was not advised of his rights under Arts. 15.17 and 38.22, V.A.C.C.P., prior to taking the statement. However, it is also undisputed that appellant had gone to the police voluntarily and was not under arrest at the time he made the statement. Moreover, Tucker testified that he had not been involved in the Corll-Henley case prior to his conversation with appellant on August 9, that appellant

was not suspected at that time of any involvement in the case other than as a witness, and that appellant had been free to go when he completed his statement. Tucker further testified that it was not until after appellant completed his statement that the Houston police were informed of statements by Henley to the Pasadena police implicating appellant in the murders.

■ The evidence clearly establishes that appellant's statement to Tucker was elicited prior to arrest and was not the result of a custodial interrogation. Appellant went to the police voluntarily. There is no evidence that the police were aware of appellant's involvement in the murders or that appellant had become the focus of police investigation. Under the circumstances, Tucker's testimony concerning appellant's August 9 statement was not barred by Art. 38.22, supra. See *Cunningham v. State*, 488 S.W.2d 117 (Tex.Cr.App.1972); *Graham v. State*, 486 S.W.2d 92 (Tex.Cr.App.1972); cf. *Creeks v. State*, 542 S.W.2d 849 (Tex.Cr.App.1976).

In addition to charging on the law of principals, the trial court gave the following charge on circumstantial evidence:

"In this case the State relies for a conviction upon circumstantial evidence.

"In order to warrant a conviction on circumstantial evidence, each fact necessary to the conclusion sought to be established must be proved by competent evidence beyond a reasonable doubt; all the facts (that is, the facts necessary to the conclusion) must be consistent with each other and with the main fact sought to be proved; and the circumstances, taken together, must be of a conclusive nature, leading on the whole to a satisfactory conclusion, and producing in effect a reasonable and moral certainty that the accused, acting as a principal as hereinbefore defined, committed the offense charged. It is not sufficient that the circumstances coincide with, account for, and therefore render probable the guilt of the defendant; they must exclude every other reasonable hypothesis except that of the defendant's guilt, and unless

they do so beyond a reasonable doubt you will find the defendant not guilty."

■ Appellant contends that the circumstantial evidence charge should not have been given since there was no circumstantial evidence of his guilt. He contends that the State relied on direct evidence, appellant's confessions, to prove his guilt. However, in his confessions appellant merely described other murders at which he had been present in case anything went wrong, and that he had been present when the deceased was killed. In order to find appellant guilty as a principal, it was necessary for the jury to infer from the evidence that he had played his usual role in the charged murder. Hence, it was not error for the trial court to give the circumstantial evidence charge. See *Ransonette v. State*, 550 S.W.2d 36 (Tex.Cr.App.1977, Opinion on Appellant's Motion for Rehearing); *Daniels v. State*, 574 S.W.2d 127 (Tex.Cr.App.1978). Moreover, the circumstantial evidence charge is a defendant's charge; in effect, it increases the State's burden of proof. Since giving the charge was not calculated to injure appellant's rights or otherwise deny him a fair trial, the error, if any, does not require reversal of the conviction. Art. 36.19, V.A.C.C.P.

■ Appellant contends, without citation of authority, that the circumstantial evidence charge given by the trial court was a comment on the weight of the evidence because the court did not apply the law of circumstantial evidence to the facts of the case. This contention is without merit. Not only was the charge as given not a comment on the weight of the evidence, but any effort to apply the law of circumstantial evidence to the facts would inevitably have constituted such a comment.

Finally, appellant contends that the trial court erred by refusing his requested charge on the law of accessories. The charge requested by appellant reads as follows:

"You are further instructed that an accessory is one who, knowing that an

offense has been committed, conceals the offender, or gives him any other aid in order that he may evade an arrest or trial or the execution of his sentence. One who aids an offender in making or preparing his defense at law, or procures him to be bailed though he afterwards escape, is not an accessory. Therefore, if you find that the Defendant, DAVID OWEN BROOKS is an accessory, or have a reasonable doubt thereof you should acquit the Defendant and say so by your verdict 'not guilty'."

Appellant contends that the statements in his second confession to the effect that he never actually killed anyone, that he had gone to Corll's house on July 10 "just to see who it was," and that he helped bury the deceased raised the issue of his guilt as an accessory and the jury should have been instructed on the definition thereof. As authority, appellant cites *Gavia v. State*, 488 S.W.2d 420 (Tex.Cr.App.1972) and *Thompson v. State*, 521 S.W.2d 621 (Tex.Cr. App.1974), each of which holds that a charge on a lesser included offense must be given if raised by the evidence.

■ Under the former penal code, being an accessory is not a lesser included offense of being a principal. Each is a separate and distinct offense, and a conviction as an accessory cannot be had under an indictment, such as the one in the instant case, charging the defendant as a principal. Art. 77, V.A. P.C. (1925); *Lopez v. State*, 170 Tex.Cr.R. 208, 339 S.W.2d 906 (1960); *Taylor v. State*, 113 Tex.Cr.R. 16, 18 S.W.2d 1078 (1929).

In *State v. Banks*, 24 Ariz.App. 369, 539 P.2d 173 (1975), the defendant was convicted of robbery, armed robbery, and kidnapping. On appeal, he contended that the trial court had erred in refusing his requested charge on accessories. In overruling this contention, the Court of Appeals of Arizona wrote:

". . . A.R.S. Sec. 13–141 (as amended 1969) defines accessories as follows:

'All persons who, after full knowledge that a felony has been committed, conceal it from the magistrate, or harbor and protect the person or persons charged or convicted or whom they have reason to believe committed a felony, are accessories.'

* * * * * *

"Having once conceded his presence at the scene, and knowledge of the commission of the crime, appellant cannot claim that he was an accessory after the fact. While the distinction between accessories before the fact and principals has been abolished, A.R.S. Sec. 13–138, and the phrase 'after the fact' has been dropped from the definition of accessory, A.R.S. Sec. 13–137, it is clear that in order to be entitled to accessory status, the crime must have been completed outside the presence of the person claiming such status. We find this implicit in the wording of A.R.S. Sec. 13–141. The dropping of the phrase 'after the fact' did not change the substance of the crime, but merely trimmed surplusage no longer necessary."

The holding in *Banks*, that a defendant who is present when the crime is committed is not entitled to accessory status, is in accord with the greater weight of authority. See *Skelley v. United States*, 76 F.2d 483 (10th Cir. 1935); *Channell v. Coiner*, 297 F.Supp. 1005 (N.D.W.Va.1969); *United States v. Anthony*, 145 F.Supp. 323 (M.D. Pa.1956); *State v. Loveless*, 140 W.Va. 875, 87 S.E.2d 273 (1955); *State v. Roberts*, 50 W.Va. 422, 40 S.E. 484 (1901); 1 Anderson, Wharton's Criminal Law and Procedure, Sec. 102 (1957); Ehrlich, Ehrlich's Blackstone, p. 752; 22 C.J.S. Criminal Law Sec. 95. Cf. *Smith v. United States*, 113 U.S. App.D.C. 126, 306 F.2d 286 (1962); *White v. People*, 81 Ill. 333 (1876).

■ Although this Court has never expressly addressed itself to this point, the following statement appears in *Weaver v. State*, 112 Tex.Cr.R. 546, 17 S.W.2d 1066 (1929):

"Appellant was indicted as a principal, and under such an indictment he could not be convicted upon testimony showing either that he was an accomplice, an accessory, or a receiver of stolen property. *Bean v. State*, 17 Tex.App. 60; *Silvas v.*

*State,* 71 Tex.Cr.R. 213, 159 S.W. 223; *Golden v. State,* 18 Tex.App. 637; *Menefee v. State,* 67 Tex.Cr.R. 201, 149 S.W. 138.

"The rule has been aptly stated as follows:

'If the defendant in a felony case is indicted as a principal only *and there is evidence that he was not present when the offense was committed,* he is entitled to have the jury affirmatively instructed that they cannot convict him on proof that he was either an accomplice or accessory or both, or that he was a receiver of stolen property when indicted only for theft.' Branch's P.C. Sec. 682." (Emphasis added.)

Since appellant confessed to being present when the deceased was murdered, the trial court did not err in refusing his requested charge on accessories.

██ The trial court instructed the jury to convict appellant if they found beyond a reasonable doubt that he was a principal to the murder of the deceased. The trial court also instructed the jury in the converse: if they found from the evidence, or had a reasonable doubt, that appellant did not aid or encourage the murder of the deceased, they must find the appellant not guilty. The charge as given adequately protected the rights of appellant, and for this reason, also, the failure to give the requested charge was not error. *White v. State,* 385 S.W.2d 397 (Tex.Cr.App.1964); *Lopez v. State,* supra; *Jones v. State,* 167 Tex.Cr.R. 72, 318 S.W.2d 444 (1958); *Spradling v. State,* 42 S.W. 294 (Tex.Cr.App.1897).

The judgment is affirmed.