### LEONA HEARNE v. THE STATE.

No. 3036. Decided March 11, 1914.

Rehearing denied April 8, 1914.

**1.—Keeping Disorderly House—Sufficiency of the Evidence.**

Where, upon trial of keeping a disorderly house, the evidence sustained the conviction, there was no error.

**2.—Same—Evidence—Leading Questions.**

Where the witness was asked by State's counsel whether he knew a certain party who lived with defendant, which the witness answered in the negative, there was no error.

**3.—Same—Evidence—Circumstances.**

Upon trial of keeping a disorderly house, there was no error in permitting State's witnesses to testify that they made arrangements with two certain women to go to defendant's house and procure rooms for the purpose of sexual intercourse, and that a certain State's witness saw the first two State's witnesses at the time they were making this arrangement and that the former went to the house of defendant and caught them all there.

**4.—Same—Evidence—Harmless Error.**

Where the court admitted improper testimony under a mistake and as soon as he discovered the same corrected it by so instructing the jury, there was no error under the facts of this case.

**5.—Same—Argument of Counsel—Bill of Exceptions.**

Where, upon trial of keeping a disorderly house, the defendant testified herself, giving the jury an opportunity to observe her whole conduct, demeanor and dress, and who could not have possibly avoided seeing the large diamonds which she wore, if she wore any, there was no error in State's counsel's argument asking the jury to look at defendant and observe the large diamonds she wore and that every glitter from them denoted a lost soul, as this was a mere flight of oratory; besides, the bill of exceptions in no way disclosed how this argument could injuriously affect the defendant in the trial of the cause. Following Pierson v. State, 18 Texas Crim. App., 524, and other cases. Davidson, Judge, dissenting.

**6.—Same—Evidence—Accomplice—Charge of Court.**

Where, upon trial of keeping a disorderly house, the evidence showed that two certain State's witnesses, one of whom was a member of the police force,

were not accomplices, it was improper in the court's charge to submit that one was an accomplice and permit the jury to pass on the fact whether the other one was also an accomplice. Following Minter v. State, 70 Texas Crim. Rep., 634. Davidson, Judge, dissenting.

### 7.—Same—Who is an Accomplice—Rule Stated.

An accomplice is a person who knowingly, voluntarily and with common intent with the principal offender unites in the commission of the crime.

### 8.—Same—Who is Not an Accomplice—Officers—Rule Stated.

Where an officer or other party understands or is led to believe that a violation of the law is in contemplation and takes steps to detect that crime or get evidence by which the guilty party may be punished, he is not an accomplice. Following Bush v. State, 68 Texas Crim. Rep., 299.

### 9.—Same—Case Stated—Accomplice.

Where, upon trial of keeping a disorderly house, the evidence did not show that either of the State's witnesses who testified against the defendant were in any way interested, aiding or abetting the defendant in the keeping of a disorderly house, with which she was charged, and the whole of what either of them did was at the suggestion of certain women to take advantage of the fact that defendant was keeping and running an assignation house, and that they went there to meet these women for illicit intercourse, they did not thereby become participants in the keeping of said disorderly house. Davidson, Judge, dissenting.

### 10.—Same—Harmless Error—Accomplice—Charge of Court.

Where, upon trial of keeping a disorderly house, the court improperly charged on the law of accomplice testimony, as the State's witnesses were not accomplices, yet the same inuring to defendant's advantage, was harmless error.

### 11.—Same—Sufficiency of the Evidence.

Where, upon trial of keeping a disorderly house, the evidence clearly, fully, completely and satisfactorily showed defendant's guilt under a proper charge of the court, there was no reversible error. Davidson, Judge, dissenting.

Appeal from the County Court of Harris. Tried below before the Hon. C. C. Wren.

Appeal from a conviction of unlawfully keeping a disorderly house; penalty, a fine of $200 and twenty days confinement in the county jail.

The opinion states the case.

*Van Velzer & Lewis* and *Heidingsfelders,* for appellant.—On question of accomplice testimony and insufficient corroboration: Dever v. State, 30 S. W. Rep., 1071; Bush v. State, 68 Texas Crim. Rep., 299, 151 S. W. Rep., 554; Brann v. State, 39 S. W. Rep., 940; Mizell v. State, 59 Texas Crim. Rep., 226, 128 S. W. Rep., 125; Chambers v. State, 44 S. W. Rep., 495; Gillian v. State, 3 Texas Crim. App., 132; Hoyle v. State, 4 Texas Crim. App., 239; Simms v. State, 8 id., 230; Weldon v. State, 10 id., 400; Birch v. State, 106 S. W. Rep., 344; Truelove v. State, 71 S. W. Rep., 601; Holmes v. State, 70 Texas Crim. Rep., 423, 156 S. W. Rep., 1172; Tracy v. State, 61 S. W. Rep., 127; Cole v. State, 70 Texas Crim. Rep., 459, 156 S. W. Rep., 929; Holman v. State, 51 S. W. Rep., 379; Smith v. State, 70 S. W. Rep., 545.

On question of argument of counsel: Bearden v. State, 79 S. W.

Rep., 37; Stephens v. State, 20 Texas Crim. App., 255; Crawford v. State, 15 id., 501; Pickett v. State, 12 id., 99; Patterson v. State, 60 S. W. Rep., 557; Byrd v. State, 47 S. W. Rep., 721; Davis v. State, 54 Texas Crim. Rep., 236, 114 S. W. Rep., 366; Machem v. State, 53 Texas Crim. Rep., 115, 109 S. W. Rep., 126; Wright v. State, 37 S. W. Rep., 732; Jenkins v. State, 49 Texas Crim. Rep., 457, 93 S. W. Rep., 726; Battles v. State, 109 S. W. Rep., 195; O'Brien v. State, 55 Texas Crim. Rep., 431, 117 S. W. Rep., 133.

*C. E. Lane,* Assistant Attorney General, for the State.

PRENDERGAST, Presiding Judge.—Appellant was convicted for unlawfully keeping a disorderly house,—an assignation house, and her punishment assessed as prescribed by law.

It is unnecessary to detail the evidence. We have carefully considered it and it is sufficient to show her guilt clearly, fully, completely and satisfactorily. In appellant's first bill of exception she complains that the State was permitted to ask Barden: "Do you know whether a fellow named Charlie Armington lived with defendant?" to which he answered, "I don't know." This clearly shows no error. Sweeney v. State, 65 Texas Crim. Rep., 593, 146 S. W. Rep., 883, and cases therein cited.

By other bills appellant objected to the witnesses McPhael and Spradley testifying in effect the arrangement they made with two girls,— Mary and Ethel,—and what was said between them at the time in arranging to go to appellant's house and procure rooms for the purpose of sexual intercourse. The record shows that these girls had the reputation of meeting men at assignation houses for sexual intercourse and that Spradley that night first met them on the streets of Houston near appellant's house; that McPhael came up and he introduced him to them; that they then made arrangements with these two girls to meet them at Mrs. Hearne's for said purpose, the girls themselves suggesting Mrs. Hearne's as the place for the purpose, telling the men to go and see Mrs. Hearne, engage the rooms and tell Mrs. Hearne that it was for Mary and Ethel. The parties then separated, the men going direct to Mrs. Hearne's house, seeing her, telling her the message the girls had sent her and she thereupon rented to them two rooms for said purpose and the girls in a few minutes thereafter came there and appellant took them to one of these rooms all for the purpose of carrying out the object of the men and girls to then and there have sexual intercourse. Clearly all this testimony was admissible. So was the testimony of Bass that he saw these two men at the time they were making this arrangement with these girls and watched them, and subsequently, on the same night, went to Mrs. Hearne's house and caught these two men and these two girls in said house on that occasion.

Under a misapprehension the court, over appellant's objection, permitted Grayson to testify that in February, 1913, he went to appellant's said house and pulled the house and arrested her for running a gambling

house, finding seven or eight men therein at the time, some hiding in various ways. As soon as the court discovered his mistake in admitting this testimony, he excluded it and told the jury that he had admitted it under a misapprehension and that they were not to consider said testimony for any purpose. While the court should not have admitted this testimony, as soon as he discovered his mistake, he corrected it and as the matter is presented it shows no reversible error.

The only other question is raised by appellant's fifth bill. It, like each of appellant's other bills, is too meager and wholly insufficient to require consideration. (James v. State, 63 Texas Crim. Rep., 75; Conger v. State, 63 Texas Crim. Rep., 312.) This bill complains of this language of the assistant district attorney in his opening argument: "Gentlemen of the jury: Look at the defendant. Look at the large diamonds in her ears, and other diamonds she wears. Don't you know that every glitter from them denotes a lost soul?" The bill in no way discloses under what circumstances or surroundings this remark of the attorney was made. If we could look to the record to complete the bill, or to make it intelligible,—even if that could be done,—it would show that appellant herself testified on the stand. Without doubt the jury did look at her and observed her whole conduct, demeanor and dress and could not possibly have avoided seeing her large diamonds which she wore, if she wore any. The bill in no way discloses that she did not wear diamonds on this occasion. The district attorney's question, "Don't you know that ever glitter from them denotes a lost soul?" was a mere flight of oratory, or poetic question. This bill in no way discloses how this did or could injuriously affect appellant in the trial of this cause. This court is frequently called upon to pass upon complaints of prosecuting attorneys' arguments and occasionally reversed cases because thereof. Each case must largely stand upon its own bottom. The rules with reference thereto are well established and have many times been clearly enunciated by this court. This court, through Judge Willson, in Pierson v. State, 18 Texas Crim. App., 524, said: "It has become quite common to except to the remarks of counsel for the State in their addresses to the jury. We find such exceptions in the majority of contested cases that come before us. If we had sustained all these exceptions, the effect would have been to have virtually closed the mouths of prosecuting attorneys. While argument should be restricted legitimately, it should not be so unreasonably limited as to render it ineffectual. The State has rights in this respect as well as defendants. And in view of the frequency of exceptions of this character, we will take occasion here to say that before we will reverse a conviction because of remarks of prosecuting counsel, it must clearly appear to us, first, that the remarks were improper, and, second, that they were of a material character, and such as, under the circumstances, were calculated to injuriously affect the defendant's rights." The Pierson case, supra, has many times been cited and approved by this court. In House v. State, 19 Texas Crim. App., 227, wherein a much worse statement, was com-

plained of, by the district attorney, Presiding Judge White said: "We construe the remark to be not so much evidence of a desire to make use of foreign matter to the injury and prejudice of defendant as an impassioned expression, highly exaggerated it may be, but springing inadvertently from the heat of debate. If all such remarks were held reversible error, but few convictions would stand the test where the case had been hotly contested by able and zealous counsel in the courts below." Again, in Tweedle v. State, 29 Texas Crim. App., 586, this court, in discussing the argument of the district attorney in that case, through Judge Davidson, said: "Concede that this argument was improper, it does not follow that the judgment should be reversed for this cause. The remarks must not only be improper, but they must be of such a nature as would be clearly calculated to prejudice the rights of the defendants. To reverse all cases where counsel fail to confine themselves to the record would render trials farces. There is hardly a case of any importance tried but that during the progress of the trial some unguarded expression is used by counsel upon either side. It would be a remarkable coincidence if this were not true. House v. State, 19 Texas Crim. App., 227; Bass v. State, 16 Texas Crim. App., 62." See, also, McConnell v. State, 22 Texas Crim. App., 354; Young v. State, 19 Texas Crim. App., 536; Frizzell v. State, 30 Texas Crim. App., 42; Rahm v. State, 30 Texas Crim. App., 310; Tipton v. State, 30 Texas Crim. App., 530; Lewis v. State, 29 Texas Crim. App., 201; Walker v. State, 28 Texas Crim. App., 503; Love v. State, 35 Texas Crim. Rep., 27. We cite only some of the older cases. A great many cases to the same effect could be cited down to this very date, but we deem it unnecessary. In our opinion this bill does not show reversible error.

The judgment is affirmed.

*Affirmed.*

DAVIDSON, JUDGE, dissenting.

### ON REHEARING.

### April 8, 1914.

PRENDERGAST, PRESIDING JUDGE.—Appellant has filed a motion for rehearing and, as a part thereof, a 17-page typewritten brief and argument. In addition to this, he has filed another 28-page typewritten argument and brief. He earnestly and vigorously contends that the evidence in this case is wholly insufficient to sustain the verdict. This is the only question we will discuss. We did not discuss this in the original opinion, deeming it wholly unnecessary.

Preliminary to stating the evidence and in connection with the discussion thereof, we will first discuss and determine whether the witnesses Spradley and McPhael were accomplices. The court in his charge stated that Spradley was, and submitted to the jury whether or not McPhael was, and required, in a proper charge, Spradley's testimony to be corroborated and if the jury believed that McPhael was that his testi-

money should also be corroborated before they could convict appellant on the testimony of either or both of them. The court gave a correct charge on the subject if it had been called for and it is in no way attacked by appellant.

The uncontradicted testimony shows that Spradley was a member of the police department of Houston on the date this offense is alleged to have been committed and for some time prior thereto and that his work in said department was to look up rooming houses, and make search for keepers of bawdy and assignation houses in the city and that in the discharge of his duty he made an engagement with the two girls, Ethel and Mary, for him and McPhael to meet these girls at appellant's house that night for the purpose of sexual intercourse with them and that he did meet them there ostensibly for that purpose. On cross-examination, at appellant's instance, he testified: "It is a fact that my sole purpose in going up to said house was in order to get evidence against this house so that I could testify against Mrs. Hearne." That he paid $4 for the room rent for himself, Spradley and the two girls that night and that the city,—the chief of police, paid him back later the $4. The evidence in no way would show or tend to show that McPhael was an accomplice in any way to the crime charged against Mrs. Hearne; he knew nothing about Mrs. Hearne's place or house, was a stranger to the two girls and introduced to them by Spradley immediately after which they made arrangements with the two girls to go to Mrs. Hearne's, and he did meet them there and himself prepared to have sexual intercourse with one of them. Neither of these witnesses are shown in any way to have been interested, directly or indirectly, with Mrs. Hearne in connection with the house she was running other or further than the mere fact that they went there to meet these two girls, the girls themselves suggesting this place to them, to have sexual intercourse. Bear in mind the offense with which Mrs. Hearne was charged! It was that she unlawfully kept and was concerned in keeping a disorderly house,—an assignation house.

What we said in Minter v. State, 70 Texas Crim. Rep., 634, 159 S. W. Rep., 300, is exactly applicable here. We quote it:

"The question of who is an accomplice and what it takes to make an accomplice is not always kept clear by our decisions. The cases are frequently indiscriminately cited on this subject. In speaking of accomplices and in treating of it in this case, we do it in its broadest sense; that is, to include principals, accomplices as such, and accessories.

"There are two rules on this subject as clear and distinct as can be. One is: An accomplice is a person who, knowingly, voluntarily, and with common intent with the principal offender, unites in the commission of the crime.

"The other is tersely stated by this court in Bush v. State, 68 Texas Crim. Rep., 299, 151 S. W. Rep., 554, in substance: Where an officer or other party understands or is led to believe that a violation of the law is in contemplation, and takes steps to detect that crime, or get evidence by which the guilty party may be punished, he would not be an accom-

plice. In such case he is not an original party to the bringing about the crime and is not guilty of originating or initiating it. In that character of case his connection with it is after the inception of the crime and after it has been determined upon, and he only then gets into it as a detective or for the purpose of arresting the party and bringing him to punishment.

"In the case of Allison v. State, 14 Texas Crim. App., 122, this court, through Presiding Judge White, said: 'From the evidence before us it does not appear that the witness Massey was an accomplice. He had been informed by defendant of his (defendant's) intention to steal Justice's horse, and he immediately told Justice's sons, and Justice himself subsequently, of defendant's intention. It is true that Justice and Massey arranged that Justice should have his horse at a certain place, doubtless with a view that they might capture defendant in the very act of committing the theft, and it is inferable that there was a further understanding between the parties that Massey was to accompany the defendant to the place and at the time when the theft was to be committed, ostensibly as his confederate, but in fact that he might aid in his arrest after the crime was consummated. Had this agreement been carried out, and the horse stolen at the time, place, and under these circumstances mentioned, Massey, in law, would not have been an accomplice in the theft. Pigg v. State, 43 Texas, 108; Johnson v. State, 3 Texas Crim. App., 590. But this agreement was not carried out, and the horse was stolen on another occasion and in a different place. Instead of being an accomplice, it appears to us from the evidence that Massey acted throughout the part of a law-abiding citizen, who, knowing that a crime was about to be committed, did, or was willing to do, all in his power to prevent it or bring its perpetrator to punishment. There was no occasion for the court to charge the law with regard to accomplice testimony in this case.'

"In Chitister v. State, 33 Texas Crim. Rep., 635, 28 S. W. Rep., 683, Presiding Judge Davidson, in discussing whether or not a witness in that case was an accomplice, for the court, said: 'That he (the witness) induced appellant to give him property to secure his departure from the State in order to be rid of his testimony did not, of itself, constitute the witness Crowley an accessory. In order to render the witness an accessory, he must have concealed the accused or given him some aid so that he may have evaded an arrest or trial, or the execution of his sentence. Penal Code, art. 86. This was not done; the witness did accept the property, and also agreed to leave the State. He, however, did not leave the State, and it is shown that he sought the bribe as a means of securing testimony for the purpose of convicting appellant for the theft of the animal set out in the indictment. He was active in the prosecution of the case, and testified in behalf of the State on the trial. This evidence did not require a charge upon the law applicable to accomplice testimony, and the court did not err in failing to so charge.'

"In Wharton's Crim. Ev., vol. 1, in section 440 (10th ed.), he says:

'An accomplice is a person who knowingly, voluntarily, and with common intent with the principal offender, unites in the commission of the crime. . . . There are certain relations recognized by the law, in which the voluntary co-operation of a person with the accused does not render such person an accomplice. Thus, those who co-operate with a view to aid justice by detecting a crime, such as accepting money with which to purchase intoxicating liquors to obtain evidence of a violation of the law, for the purpose of prosecuting the seller for an unlawful sale, is not an accomplice; nor is an informer technically an accomplice; nor a detective who joins a criminal organization for the purpose of exposing it, even though, to aid such exposure, he unites in and apparently approves its counsels; nor the agent who purchases a libelous publication for the purpose of giving evidence against the publisher; nor a disguised emissary who, by purporting to be a friend of the parties suspected, seeks to draw from them inculpatory information.'

"In 4 Ency. of Ev., p. 630, the law on this subject is thus stated: 'The fact that a detective in securing evidence of a crime is the instrument or means through which the law is violated does not make him an accomplice within the rule requiring the testimony of accomplices to be corroborated. Thus one who purchases liquor sold in violation of law for the purpose of securing the conviction of the offender is not an accomplice, nor is one who receives a counterfeit, or stolen goods, or buys a lottery ticket, or participates in a gambling game for the same purpose. So, also, one who pretends to be an accomplice, and apparently assists in the preparations for a crime with the purpose and intention of frustrating the design of the guilty parties and securing their punishment is not an accomplice whose testimony requires corroboration, even though he actually takes an apparent part in the commission of the offense.'

"In the recent work of Mr. Underhill (2nd ed.), on Crim. Ev., in sec. 69, he says: 'A person who, as a detective, associates with criminals or communicates with or aids them solely for the purpose of discovering commission of crime, and procuring the punishment of the criminals, is not an accomplice.'

"In 12 Cyc., p. 447, the rule is thus laid down: 'One who, as a detective, associates with criminals solely for the purpose of discovering and making known their crimes and who acts throughout with this purpose, and without any criminal intent, is not an accomplice, and it is immaterial that he encourages or aids in the commission of the crime.'" Holmes v. State, 70 Texas Crim. Rep., 423, 156 S. W. Rep., 1172; Ausbrook v. State, 70 Texas Crim. Rep., 272, 156 S. W. Rep., 1177.

The evidence in no possible way suggests or intimates that Spradley or McPhael, either or both of them, were in any way, directly or indirectly, aiding or abetting Mrs. Hearne in the keeping of this house for assignation purposes or any other purpose. The whole of what either of them did was at the suggestion of these girls, to take advantage of the fact that Mrs. Hearne was keeping and running such a house and that they went there at the most, to meet these girls for illicit intercourse.

In no way thereby did they become participants in the keeping of said house by Mrs. Hearne.

The court should not have charged that Spradley was an accomplice, nor submitted whether or not McPhael was, for neither of them were. However, this was to appellant's advantage and not her disadvantage and she can not complain thereof. So that we treat the evidence of each of these witnesses as the testimony of any other, and the court below should have done so. Even if they were accomplices, they were amply corroborated.

Brushing the question of these witnesses and neither of them being accomplices, aside, or even considering them as accomplices, we then proceed to show what the testimony was. We do not give the appellant's testimony, because in testing whether or not the evidence is sufficient, we look only to the inculpatory evidence to ascertain, as a matter of law, whether that is sufficient or not. It may be that the testimony of an accused may be sufficient to justify an acquittal. This court has nothing to do with that. This is a question for the jury, and the jury having passed on it and believed the inculpatory testimony, this court can only pass upon whether it was sufficient to justify their verdict.

Some of the witnesses expressly testified that Mrs. Hearne told them she was the keeper of that house. She was, in fact, there that night and had charge of it. By her own testimony she had lived there continuously for more than six months at this time. In Stokeley v. State, 37 Texas Crim. Rep., 638, Judge Hurt, for this court, held that where a man permitted one woman, for less than a half of a night, to occupy his residence and have intercourse with men, he was guilty of keeping a disorderly house. This court in Flynn v. State, 35 Texas Crim. Rep., 220; Stone v. State, 47 Texas Crim. Rep., 575, and Willis v. State, 34 Texas Crim. Rep., 148, in effect, expressly held that where one person owns the property and another has possession, charge or control of the same, the latter is, under the statute, the owner, so far as being the keeper, etc., is concerned. There can be no question from this testimony and the law that Mrs. Hearne was the keeper, in contemplation of the statute and the law, of this house at the time.

Did she keep it is an assignation house? Mr. Barden, the owner of the house, testified that at the time this offense is charged, the part kept by Mrs. Hearne was reputed to be an assignation or whorehouse. Mr. Mills, the owner of property in the immediate neighborhood of this house, testified that its general reputation was that it was used as an assignation house and had been known as such for more than a year before the date of this offense. Mr. Bass, a police officer, whose duty it was to locate assignation houses and do such like work, and who watched these parties and saw that they went to Mrs. Hearne's house that night and afterwards participated in their arrest, testified that the two said girls, Ethel and Mary, had bad reputations for visiting houses of assignation. Mr. Sisk, who was also a special police officer, testified that on and prior to August 30th, the date said offense is charged, he

knew the general reputation of said place and that it was that of an assignation house; that he watched the place for awhile and saw a young woman and man stop on the corner; the man went across up to this house, came back, got the young woman and that both together went up there; that after remaining awhile they came down. Mr. Poole, another police officer, whose duty was looking after such houses, testified that he had heard the house talked about as being an assignation or whorehouse and from that talk said house was an assignation house; that he had watched that place and had seen different persons go into and come out of it; that sometimes he had seen as high as four or five doing this covering a period of an hour's time only; that sometimes a man would go and sometimes a woman would go alone, and then sometimes they would go up there in couples,—men and women. On cross-examination he said that he had known the reputation of the house for several months, five or six, before this offense was charged and that he knew the reputation of said house was that of an assignation house and had known it for these five or six months.

Without naming the witnesses, because we deem it unnecessary, the testimony of the State then clearly and distinctly shows that Spradley met and was introduced to these two girls, Ethel and Mary, by another girl on this night on the streets of Houston; that he stopped and was talking to them. While talking to them McPhael was passing and he called him and introduced him to these girls; that the two men then made arrangements with these two girls to meet them somewhere that night and have sexual intercourse with them. Upon inquiring from the girls as to where they should go, the two girls suggested that they go to Mrs. Hearne's. The men didn't seem to know where this was. The girls said they would go with them and point out the house to them. The girls told these two men to see Mrs. Hearne, tell her that Mary and Ethel sent them there, and to engage rooms and that they would themselves soon come. Spradley and McPhael proceeded to see Mrs. Hearne. They found her sitting on the stairway, delivered their message from Ethel and Mary, and Mrs. Hearne invited them up and they went up. She took them to two rooms; she supplied towels for them; she told them to go in one room and undress and that when the girls came she would take them in the other room and they would undress and that one of the men could go in the room where the girls undressed and one of the girls go in the room where the men then were. This was all carried out under her suggestion and instructions. There was a door between the two rooms. Before the girls arrived, however, they telephoned to Mrs. Hearne, told her that they were afraid to come up to her house to the two men; that they thought officers were watching them, but Mrs. Hearne insisted upon their coming anyhow; they thereupon proceeded to meander around from block to block and street to street, seeking to elude the officers, or have the officers abandon watching them. Mrs. Hearne told them to come up the backway and gave them directions about how to get up that way. The backway to her premises was a circuitous or elusive

way, and led through an alley or part of an alley, and probably through an old vacant house. Anyway it was not in view from the street and access to her house that way seemed an ideal one for persons of that character to reach it and depart from it and not be detected. When the girls came she took them to their room. They immediately proceeded to undress. As soon as they did, one of the girls went to McPhael's room and lay down on the bed ready for business. McPhael proceeded to undress and himself was almost ready for business. Spradley went to the other room to the other girl. She had undressed and had sat down on the bed undressed. Spradley was more leisurely in undressing. He thought the officers had been watching and was anticipating a raid by the officers and was delaying undressing on that account. Spradley paid Mrs. Hearne $4 for the use of the two rooms for business. Each of the girls demanded of the men $5 apiece. Each promised to pay when they got ready for business. Bass, the officer, had seen Spradley and McPhael with these girls and saw their maneuvers, marching around the town when the girls were showing Mrs. Hearne's house to them. He saw the parties separate and the men go, he presumed, to Mrs. Hearne's. He then continued watching the girls. They marched around first one block or street and then another, and when they thought they had given Bass the slip they proceeded to carry out their engagement with these men and slipped up the backway to Mrs. Hearne's. When the parties were in the attitude above described,—the two women undressed and ready for business,—McPhael about so, and Spradley delaying. Mrs. Hearne had again gone partly down the back stairway, doubtless either watching for the officers or for other customers. Bass, in the meantime had communicated to headquarters and the chief of police detailed three other officers to raid this house and arrest these parties. They proceeded to do so, and when they got in sight of Mrs. Hearne, approaching the stairway where she was, she hastily retreated upstairs, locked the door and alarmed these men and these girls, directing the girls to dress as quickly as possible and to come in the room with her and her daughter and be visitors when the officers came in. She told the men to dress as quickly as possible and go in another room where another man was and to be there playing cards and appear as room renters. Her instructions were carried out by both the girls and the men. The officers were ringing the bell, knocking, seeking admittance. She cut off the bell so it wouldn't ring and after giving ample time for the men and girls to carry out her instructions and the girls to be in her room as guests and the men to be in the other room as roomers playing cards, she graciously then, and not until then, opened the door and let the officers in. They proceeded to arrest all the occupants,—men and women,—and carried them to police headquarters.

After carefully again reviewing the evidence we repeat what we said in the original opinion: "The evidence is sufficient to show appellant's guilt, clearly, fully, completely and satisfactorily."

The motion for rehearing is overruled.          *Overruled.*

DAVIDSON, JUDGE (dissenting).—When the decision herein was originally handed down I noted the fact that I could not agree to the affirmance. Motion for rehearing was overruled in an opinion by Judge Prendergast.

The information charges appellant, in the first count, with keeping and being concerned in keeping a bawdy house, and as a house kept for the purpose of prostitution, and as a house where prostitutes were permitted to resort and reside for the purpose of plying their vocation. The second count charges appellant did unlawfully keep and was concerned in keeping a disorderly house, the said house then and there being a house, room and place where men and women met by mutual appointment, and by appointment made by another for the purpose of sexual intercourse. The court in his charge submitted the case to the jury on the theory that if they should believe that men and women met by mutual appointment, and by appointment made by another, at said house, for the purpose of sexual intercourse, they would find appellant guilty. He further charged that under the first count the jury could not convict and withdrew that from their consideration. So the second count, or the one which charges appellant with keeping a place where men and women met by mutual appointment, or by appointment made by another for the purpose of sexual intercourse, was the count submitted.

I might perhaps take the statement made by the opinions, original and on rehearing, as sufficient, but in addition to what was said I desire to add this: One of the parties who says he met the girls at appellant's residence was named McPhael. He says: "Mr. Spradley made the arrangements with Mrs. Hearne, at which time I was present. At the time Spradley and I went up to this place, Mrs. Hearne was sitting in the door at the bottom of the stairway, and Spradley said Mary and Ethel said we could get rooms; we are looking for rooms; so she told us to come on upstairs; so we went on upstairs, and in a few minutes she came up and showed us the rooms we could take, and in a few minutes later, say ten or fifteen, the girls came up; if I remember just right, they came up from the backway. I paid Mrs. Hearne $2 for the room, and I suppose Spradley paid her the same amount. We were up there with the girls before the officers came, hardly a half hour. The officers who came were Mr. Bass, Mr. Poole, Dr. Hudson and Mr. Gelney. For a few minutes there we were all in the same room; Mrs. Hearne was in there too; she came and collected the room rent." This witness testified he was a deputy United States marshal at the time, and later became a policeman in the city of Houston. He says: "I met those girls and went up to that place, No. 807½ San Jacinto Street, at the instance and request of Mr. Spradley; he asked me to go. I knew that Mr. Spradley was a police officer, and I at that time was a deputy United States marshal. I thought said house that I and Mr. Spradley and the girls were visiting was an assignation house. When Mr. Spradley and I went up to this house I thought the girls were taking us up there. I wasn't

roped in to going up there, but I did not make any suggestion about going up there. Mr. Spradley suggested going out and having a good time." Spradley testified he was a member of the police department of Houston, and "was working in the humane department and in connection with rooming houses and places like that." He said he went to the place in question and asked for Mrs. Hearne, and had a conversation at the door with her. "McPhael was with me. We walked up there and we spoke to her and we asked her if we could get a room, and she asked us who was with us and I told her these girls' names, Mary and Ethel." This witness says he was an officer of the law, but did not arrest Mrs. Hearne. He says he may have known she was violating the law, but he would not arrest her until he got a warrant. This witness testified further that he met these girls on Main Street, and McPhael came to where he was talking with them and they made arrangements there with the girls to go out that night. During the conversation it was suggested that Mrs. Hearne's would be a place to go. That he went from the place of the conversation to make arrangements with Mrs. Hearne for a meeting with the girls and paid her four dollars. McPhael testified that he paid his part of it himself with two dollars. In addition to what is said in the two opinions of my brethren I think this will be sufficient.

The statute provides that an assignation house is a house, room or place where men and women meet by mutual appointment, or by appointment made by another for the purpose of sexual intercourse, whether at such place vinous, spirituous or malt liquors are kept for sale or are used or not. Another provision of the Act of 1907, p. 246, is that, "It shell be unlawfu for any person to invite, solicit, procure, allure or use any means for the purpose of alluring or procuring any female to visit and be at any particular house, room or place for the purpose of meeting and having unlawful sexual intercourse with any male person, or to take part, or in any way participate in any immoral conduct with men or women, or to use at such place any intoxicating liquors, or to give to any person the name and address, or either, or photograph of any female for the purpose of enabling the person to whom such name, address or photograph of such female is given and furnished to meet and have unlawful sexual intercourse, or to bring about or procure such unlawful sexual intercourse with such female by any other person. Any person violating any of the provisions of this section shall be deemed guilty of a misdemeanor and upon conviction shall be fined not less than fifty nor more than two hundred dollars, and in addition thereto shall be confined in the county jail not less than one nor more than six months." So it will be observed that these two officers, Spradley and McPhael made arrangements with these two girls, if their testimony be true, to go with them to a rendezvous, and they say it was agreed that Mrs. Hearne's place would be a fitting establishment. Spradley says that he met the girls, introduced McPhael, and made arrangements for himself and McPhael to meet these two girls, to which arrangement McPhael readily agreed, and they were going out "to have a good time." They testified

they went and secured two rooms at Mrs. Hearne's house. They further testified they were in the rooms with these girls when the officers came, and that the door was locked a sufficient length of time for them to dress and get themselves together, and get in another room altogether, and they were in there when the officers came up. So the officers who came up did not see them in a private room. Mrs. Hearne denies that there was anything indicating an assignation. The girls were not used as witnesses. The record does show they were arrested but discharged by the order of the chief of police, and were not prosecuted. Under the statute just quoted it would hardly be questionable, if Spradley and McPhael had been prosecuted under the article read and convicted, that this court would have affirmed the judgment, if their testimony is true. They induced Mrs. Hearne by the payment of money to let them have two rooms as they testified, and so far as this record is concerned this is the only assignation, if this be one, that had occurred in that house. The officers testified that they had watched the house, but this is the first time they had any facts; at least it is the first time any arrest occurred. On one or two occasions there is some evidence that a man and woman had been seen to go to and go away from this place. There is evidence that she was keeping a boarding or rooming house, and the officers never thought sufficiently of this matter even to undertake to arrest anybody. So if this be an assignation house, it is made so by the fact that Spradley and McPhael and these two girls met at this house on this occasion. If that be sufficient evidence to make this an assignation house, and both Spradley and McPhael testified they did not have intercourse with the girls, but simply went there, then that meeting was brought about by Spradley and McPhael renting the rooms of that house and inducing appellant to constitute it an assignation house. There could not have been an assignation at that place without their contrivance and at their instigation, as shown by their evidence and at their request, and was not, and there is no evidence in the record to show otherwise. Then if this was an assignation house, it was made so under this record by this one evening's performance brought about by Spradley and McPhael inviting these two girls to go there and their subsequent meeting at that point, and inducing appellant to let them have the rooms for that purpose. Those girls were there by the procurement and mutual agreement with Spradley and McPhael under the testimony of those two men. They invited these girls there; Spradley induced McPhael to go with him. He solicited the girls to go with him and McPhael; and the assignation, if one was made in fact, was made at their instigation, and Mrs. Hearne was induced to rent two rooms to them. If this does not make them accomplices, then it would be difficult to understand what character of testimony it would take to make accomplices. They induced Mrs. Hearne to assign them to two rooms, and the evidence shows this is the only instance in which the thing ever occurred there, and by that means it was made an assignation house, if it was one at all, and these are all the facts that show there was ever any assignation in the house.

Then Spradley was guilty under article 359a, Acts of 1907, p. 246, of inviting and soliciting and procuring these girls to go there, one of them to go with himself and the other with McPhael. McPhael agreed and went. They were both guilty under article 359a of violating the law in inducing these girls to go there, and inviting them there for the purpose of prostitution. They had induced Mrs. Hearne to assign them these rooms. In the case of Dever v. State, 37 Texas Crim. Rep., 396, Judge Hurt lays down the rule there that where a party persuades and invites others to enter into the commission of an offense, without even intending really to be a participant, or with the intent to secure their arrest, punishment and the probable reward, is guilty as a principal, if the offense be completed, for, when a person does a prohibited act, with the intent the law forbids, it will not avail him that he also intended ultimate good. If, by his acts and conduct, he encouraged, advised or persuaded others to commit the crime, he would himself be guilty regardless of whether he intended to consummate the crime or not. In that case Judge Hurt distinguished the rule laid down in Woodworth v. State, 20 Texas Crim. App., 375, from the rule announced in the Dever's case. The distinction is readily perceivable and the margin wide between them. Where an officer, understanding that a crime is to be consummated, or is in course of being brought about and carried out, and he falls in line as a detective, he would not be a principal or an accessory, or a guilty participant, because the crime has already been put into operation in part or in whole; but where he is in the inception of the crime, and helps to bring that crime about and assists in it in order that he may arrest, as he says, the parties, he is a guilty participant, and his official character is no protection against the act. That rule is thoroughly settled. No officer has a right to violate the law on the theory that he claims he is doing it for ultimate good. An officer is to suppress crime and not organize crime in order that he may punish somebody. We had occasion to go over this matter again in Bush v. State, 68 Texas Crim. Rep., 299, 151 S. W. Rep., 554. This language was used: "Wherever a party deliberately or intentionally originates or succeeds in bringing about a violation of the law, he becomes a particeps criminis of that violation, and therefore when used as a witness must be corroborated. There is a line of cases which holds that where an officer or other parties understand or are led to believe that a violation of the law is in contemplation, and takes steps to detect that crime, or get evidence by which the guilty parties may be punished, he would not be an accomplice, but in such cases he is not an original party to the bringing about the crime and is not guilty of originating or initiating it. In that character of case his connection with it is after the inception of the crime and after it has been determined upon, and he only then gets into it as a detective or for the purpose of arresting the party and bringing him to punishment. There is another line of cases which holds that, where the party originates the crime or is instrumental in its initiation and brings it about, he then becomes a particeps criminis and when testi-

fying as a witness in the case is an accomplice. The leading cases in this State are Dever v. State, 37 Texas Crim. Rep., 396, 30 S. W. Rep., 1071; Steele v. State, 19 Texas Crim. App., 425. The opinion in the Dever case was by Judge Hurt and draws the distinction above mentioned between parties who were playing the role of detective for the arrest and punishment of parties, and those who originate the crime or assist in originating it in the first instance." The propositions here announced in the Bush and the Dever cases have been recognized as correct. If these authorities are correct then under the facts detailed by these two witnesses, Spradley and McPhael, they are accomplices. This crime could not have been brought about and was not brought about, nor even instigated, except at the hands of and by Spradley and McPhael. By their act this was made an assignation house at the time, if it was such at all, and how it could have been made such without their concurrence, this record does not indicate. The trial judge recognized the fact that Spradley was an accomplice, and so charged the jury. He recognized that McPhael was an accomplice, but submitted the fact to the jury. McPhael was equally an accomplice under the law with Spradley. He was associated with Spradley from the beginning to the end of it. It is true that Spradley first solicited one of the girls to go with McPhael, and then called McPhael and he assented to it. From that time on McPhael was heart and soul, under his testimony, co-operating. He paid his money for a room. If Spradley and McPhael are accomplices, then the evidence in this case is not sufficient. They are not corroborated as to their purpose of being at the house. They are corroborated as to the fact that they were there in a room with the other parties at the time the officers came, but there is nothing to indicate that anything was being done that was wrong. Mrs. Hearne was not arrested at the time, and the girls who were subsequently arrested were discharged. Mrs. Hearne denies practically there was anything indicative of an assignation; that she was not carrying on an assignation house; that she had rooms there for lodgers and parties who wanted to rent rooms; that she was trying to make a living to support her invalid son and his wife and child, and was raising her fifteen or sixteen-year-old daughter who was there in the house with her. So this case could not be affirmed on the facts if Spradley and McPhael are accomplices for want of necessary corroboration showing that Mrs. Hearne was keeping an assignation house, and inasmuch as this is the only instance shown in the history of the house of any assignation meeting, it was necessary to make this case clear enough and strong enough to authorize a conviction. This was not done so far as the corroboration of McPhael and Spradley is concerned. Take their testimony out of the case and there is not sufficient evidence to indicate that there was any assignation at the time or that this was an assignation house.

There is another question in the case that I think my brethren erroneously decide. The bill is quoted as follows: "Upon the trial of the above styled and numbered cause the district attorney, making his

opening argument to the jury, stated as follows: 'Gentlemen of the jury: Look at the defendant. Look at the large diamonds in her ears, and other diamonds she wears. Don't you know that every glitter from them ·denotes a lost soul?' To which statement counsel for the defendant then and there in open court objected and submitted a written request to the court requesting the court to instruct the jury not to consider the statement above made by the district attorney. The court refused said request, and in refusing said request stated to counsel for defendant in the presence of the jury that the State had a right to make that kind of comment, and that the jury has a right to consider the jewelry, wearing apparel and general appearance of all the witnesses in the case. To which action of the court in not instructing the jury to disregard the statement objected to of the district attorney, and also to the statement of the court in telling the jury that they had a right to consider the jewelry, wearing apparel and appearances of all the witnesses, defendant then and there objected and tenders this his bill of exception," etc. This bill is signed without qualification. My brethren, passing upon this matter, say: "It, like each of appellant's other bills, is too meager and wholly insufficient to require consideration. (James v. State, 63 Texas Crim. Rep., 75; Conger v. State, 63 Texas Crim. Rep., 312.) This bill complains of this language of the assistant district attorney in his opening argument." Then the opinion says: "The bill in no way discloses under what circumstances or surroundings this remark of the attorney was made. If we look to the record to complete the bill, or to make it intelligible,—even if that could be done,—it would show that appellant herself testified on the stand. Without doubt the jury did look at her and observed her whole conduct, demeanor and dress and could not possibly have avoided seeing her large diamonds which she wore, if she wore any. The bill in no way discloses that she did not wear diamonds on this occasion. The district attorney's question, 'Don't you know that every glitter from them denotes a lost soul?' was a mere flight of oratory, or poetic question." It may have been a flight of oratory or poetic question, but as Judge Prendergast says, if we look to the statement of facts we would absolutely fail to find any word or indication in it anywhere that appellant wore any diamonds or owned any diamonds. This was a flighty statement of the district attorney which should not have been indulged, and it passed far out into the fields of poesy, but the district attorney ought not to be permitted to go out in his fugitive exploitations into poetic fields and state things that were not in evidence. I should hardly imagine the district attorney would have offered to impeach appellant's testimony by proving the fact that she may have worn diamond ear-rings or jewelry of any sort. Before a district attorney, or a prosecuting officer is permitted to comment on matters of this sort, there ought to be some fact in the record that would justify it. In fact, the flight of oratory out into poetic fields must have been finely drawn when the district attorney could see the glitter of lost souls reflected in the diamonds, and if these were images thrown back from their glitter, it

must have been at the time and place of the reflection, towit: the trial. The reflection of the images of lost souls were those who were then in such position as to be shown in the reflection. However this may be and however much the prosecuting officer was inclined to indulge in fugitive flights of poetry, it was not legitimate as a means of bringing about a criminal conviction and on facts that were not before the jury. He would not have been so permitted to testify, and there was no evidence before the jury of the matters that he discussed in this poetic flight. I can not agree that this sort of argument should be permitted. If a defendant can not be convicted upon the testimony and the presumption of innocence overcome by facts, it ought not to be done by illegitimate argument, even if it has to clip the wings of poetic and fugitive flights of oratory. Appellant is entitled to a fair trial on the facts, and the argument should be confined to the facts. Convictions should be based on proved facts and not on absence of evidence. In the opinion of Judge Prendergast the argument of the district attorney only is alluded to. The remark of the court justifying the remarks of the district attorney is not mentioned. I am of the opinion that the remark of the trial judge should not have been indulged. He was but emphasizing the wrong committed by the district attorney, and as one of our opinions says, the jury is somewhat prone to look upon the "trial judge as the Lord's anointed."

For the above reasons I respectfully dissent.