## AGNES ORNER v. THE STATE.

No. 3674. Decided January 5, 1916.

**1.—Murder—Indictment—Arraignment—Change of Venue.**

Where, upon trial of murder, the venue had been changed to several counties and finally the case was returned for trial to the original county where

defendant was convicted, and she alleged in her amended motion for new trial, supported by the affidavit of her attorney, that the original indictment had not been read to the jury when she was arraigned, but that a certified copy thereof was read instead, which motion was contested by the State contending that the original indictment was read, and the lower court heard the motion and the evidence thereon and overruled the same, and the judgment of the court recited that the indictment was read to the jury, there was no reversible error.

### 2.—Same—Original Indictment—Certified Copy—Practice in the District Court—Waiver.

Where appellant contended that the original indictment had not been read to the jury when she was arraigned, and both the original and a certified copy of the indictment were sent up with the record, and were identically the same, and no possible injury could have occurred to the defendant even if the certified copy instead of the original was read to the jury, there was no reversible error; it appearing from the record that no objection was made until long after the verdict, and it must be presumed that the defendant waived the reading of the original indictment; however, it also appeared that defendant was arraigned under the original indictment. Following Barbee v. State, 32 Texas Crim. Rep., 170, and other cases.

### 3.—Same—Rule Stated—Waiver—Arraignment—Estoppel.

In natural reason one should not complain for the thing done with his consent, and the law in all its departments follows this principle; it is analogous to estoppel, or a species of it, and under article 22, Code Criminal Procedure, a defendant could waive an arraignment under the original indictment where a true copy was used instead.

### 4.—Same—Evidence—Former Testimony—Practice in District Court.

Where, upon trial of murder, each side introduced the testimony of different witnesses which was given by them in a former trial and taken down in writing, among whom was a witness for the State who testified as to declarations by the defendant to the effect that she had killed the deceased, there was no error in permitting to be read the testimony of said witness to the jury, after they had been charged by the court and retired to consider their verdict; the jury returning into court saying that they did not remember the names of the several witnesses and wanted their testimony reread. Following Clark v. State, 28 Texas Crim. App., 189, and other cases.

### 5.—Same—Evidence—Declarations of Defendant.

Where, upon trial of murder, the evidence was amply sufficient that defendant had killed her husband by poisoning, with arsenic, about nineteen months before defendant's daughter was killed by the same kind of poison; and that after the death of her husband defendant was suspected of killing him by poisoning, and a post-mortem examination was made, but it was not ascertained whether he was so killed, but that the deceased frequently charged her mother with poisoning the father of deceased, there was no error in admitting in evidence the declarations of defendant made after the death of her husband and before that of her daughter to the effect that she knew of a poison which, administered to a person, could not be detected by a physician. Davidson, Judge, dissenting.

### 6.—Same — Evidence — Objections to Testimony — Practice in District Court.

Where, upon trial of murder, the defendant objected to the manner in which she was cross-examined by the State's counsel, with reference to the sudden death of a certain man, and also to the sudden death of her two other children, and the bills of exception did not show the answer to many of the questions propounded, and none of them showed any reversible error, and no injury was shown to the defendant even if some of the questions were im-

proper and should not have been asked, there was no reversible error. Following Phillips v. State, 59 Texas Crim. Rep., 534, and other cases.

**7.—Same—Rule Stated—Withdrawal of Testimony—Practice in District Court.**

It is well settled that even where questions are answered and the court then withdraws the matter from the jury and instructs them not to consider it, no reversible error is presented, especially where the attorneys for defendant must not have attached any significance to the matter at the time. Following Miller v. State, 31 Texas Crim. Rep., 609, and other cases. Davidson, Judge, dissenting.

**8.—Same—Evidence—Declarations of Third Parties.**

Where, upon trial of murder by arsenic poisoning of defendant's daughter, the evidence disclosed that defendant was suspicioned of killing her husband some months previously by the same kind of poisoning, there was no error in admitting testimony that the witnesses repeatedly heard the deceased charge her mother, the defendant, that she killed said husband.

**9.—Same—Evidence—Post-mortem Examination.**

Upon trial of murder, where defendant was tried with killing her young daughter by arsenic poisoning, and defendant was also suspicioned of having killed her husband in the same manner shortly prior thereto, and that a post-mortem examination had been held upon her husband's body, there was no error in permitting the physician who made such examination to testify that he could not chemically analyze the organs of deceased husband at the time, because they had been placed in a vessel which contained formaldehyde, etc.

**10.—Same—Evidence—Examination of Dead Body.**

Where, upon trial of murder, defendant was charged with killing her young daughter by arsenic poisoning, and it was also disclosed that she was suspicioned of having killed her husband in the same way some months prior thereto; that a post-mortem examination had been made of the body of said husband, and no poison had been found at that time, but that some time thereafter said body was exhumed for another examination, there was no error in admitting testimony of the undertaker to show the identity of the body of said husband and the testimony of the physician who chemically examined the same and found arsenic poison therein; it having also been shown that the deceased frequently charged the defendant with poisoning her, deceased's, father, which showed motive; besides, the bills of exception were defective. Following Ortiz v. State, 68 Texas Crim. Rep., 524, and other cases. Davidson, Judge, dissenting.

**11.—Same—Sufficiency of the Evidence.**

Where, upon trial of murder, the evidence, although conflicting, was sufficient to sustain the conviction, there was no reversible error.

**12.—Same—Evidence—Other Offense—Motive—Charge of Court.**

Where defendant was charged with the murder of her young daughter by administering arsenic poison to her, and it appeared upon the trial that she was strongly suspicioned of having killed her husband in the same way some months prior thereto, there was no error in admitting testimony that defendant did kill her husband in the same way, for the purpose of showing motive, the court limiting his charge thereto. Davidson, Judge, dissenting.

Appeal from the District Court of El Paso. Tried below before the Hon. Dan M. Jackson.

Appeal from a conviction of murder; penalty, imprisonment for life in the penitentiary.

Vol. 78 Crim.-27

The opinion states the case.

*Moore & Harris, Charles Owen,* and *T. A. Falvey,* for appellant.— On question of reading certified copy of indictment: Essary v. State, 53 Texas Crim. Rep., 596, 111 S. W. Rep., 927; McKinney v. State, 48 Texas Crim. Rep., 402; Wilkins v. State, 15 Texas Crim. App., 420.

On question of waiver: Carter v. State, 58 S. W. Rep., 80; Barton v. State, 9 Texas Crim. App., 261; Burton v. State, 46 Texas Crim. Rep., 493.

On question of admitting written testimony after jury had retired: McKinney v. State, 48 Texas Crim. Rep., 402; Campbell v. State, 42 Texas, 593.

On question of defendant's declaration that she knew of a poison which, when administered, could not be detected: Haggart v. State, 178 S. W. Rep., 33; Poole v. State, 45 id., 348; Heffington v. State, 41 id., 315; Tomlin v. State, 25 Texas Crim. App., 676.

On question of propounding questions to witness: Grimes v. State, 64 Texas Crim. Rep., 64, 141 S. W. Rep., 261; Smith v. State, 55 Texas Crim. Rep., 563, 117 S. W. Rep., 966; Davis v. State, 54 Texas Crim. Rep., 236, 114 S. W. Rep., 366.

On question of admitting testimony of defendant's husband: Menefee v. State, 67 Texas Crim. Rep., 201, 149 S. W. Rep., 138; Chandler v. State, 60 Texas Crim. Rep., 329; Pace v. State, 58 id., 90; Ware v. State, 36 id., 597.

*C. C. McDonald,* Assistant Attorney General, for the State.—On question of admitting written testimony of former trial on request of jury: Claton v. State, 44 S. W. Rep., 165, and cases stated in opinion.

On question of introducing testimony of other offenses: Leeper v. State, 29 Texas Crim. App., 63; Hamblin v. State, 41 Texas Crim. App., 136, and cases stated in opinion.

On question of declaration of third parties of defendant's guilt of killing her husband: Gray v. State, 47 Texas Crim. Rep., 375; Weaver v. State, 43 id., 340.

PRENDERGAST, PRESIDING JUDGE.—Appellant was convicted of the murder of her own daughter by poison, and her punishment assessed at life imprisonment.

This is the second appeal of this case. The first is reported in 65 Texas Crim. Rep., 137. No question which was decided on the first appeal arose on the last trial. After the other reversal the venue was changed from El Paso County, and trials, or mistrials, had in four other counties, to which the case was respectively transferred on change of venue. The venue was at last changed back to El Paso County, and this trial had therein. Before the venue was first changed from El Paso County, this record shows that appellant was properly arraigned and pleaded not guilty.

This trial was begun February 23rd and was concluded March 3,

1915. On March 5th, appellant filed a motion for a new trial on various grounds. That motion, as this record shows, did not then in any way claim that the indictment was not read to the jury when the trial began. Later, appellant had leave of the court to file her amended motion for a new trial, and, on March 20, 1915, for the first time set up as one of her grounds for new trial that the indictment was not read, but that a certified copy thereof was read instead. Her amended motion was supported by the affidavits of two of her attorneys, who, in effect, swore that a certified copy, and not the original, was read to the jury. The affidavit of each of her attorneys contains allegations tending to show that they were correct in stating that a certified copy and not the original was read. The district attorney, who, in connection with an assistant, represented the State on the trial, under his official oath denied that the copy was read and as pointedly alleged that the original was, and not the copy. The assistant district attorney made an affidavit, wherein he swore positively that the original was read and that the copy was not, and therein he alleged other facts borne out by the record, which tended to support him in his affidavit. The said motion and amended motion and all of said affidavits were heard by the trial judge on March 20, 1915, whereupon he overruled appellant's motion for a new trial on that ground, and every other as well. In addition to this, the judgment specifically states that, when the case was called for trial the State appeared, as did the defendant in person, and her counsel also being present, when both parties announced ready for trial. It proceeds: "The indictment was read to the jury, and the defendant, Agnes Orner, in open court pleaded not guilty to the charge contained in the indictment herein." There can be no question but that from all this the conclusion is certain that the judge was authorized to believe, and must have believed, that the original, and not said copy, was read to the jury, and that it was to the reading of the original, and not the copy, that appellant plead not guilty.

The record in some particulars on this point is not clear. In approving appellant's bill on this subject, it appears that the judge did so on March 15th, which was five days before said affidavits and the motion for a new trial presenting that question were filed and heard. By his qualification of the bill at that time, the judge states that some time at or about the close of the evidence something was said by defendant's counsel, that the indictment had not been presented, but that in lieu thereof a certified copy of it had been read to the jury. Whereupon he examined all the papers in the cause, which were voluminous, and in said papers was found a certified copy of the indictment, and the said assistant district attorney, representing the State, shortly thereafter presented to him the original indictment, at the time stating to him that it was the original which was read to the jury. He then states: "The court has no way of determining which instrument was read to the jury, as he does not know." From this, we take it, it is reasonably certain that the judge at that time, and at the time he made this qualification, had not heard the motion, nor said affidavits, but he

states what he did at about the time of the conclusion of the evidence in the case on his own independent investigation at that time. Hence, we conclude that his then qualification in no way militates against his action when he heard the motion and all the affidavits, as shown above.

In addition, both the original and a certified copy thereof, under the order of the lower court, were sent up and constitute a part of this record. We have examined and carefully compared the copy with the original and find there is no particle of difference between them. Every word, letter and figure in the original is copied precisely in the certified copy. If it had been the copy instead of the original which was read, no possible injury occurred to appellant thereby or could have occurred. If it be true that the copy, and not the original, was read, it was all done in her presence and must have been with her knowledge, and it was also in the presence of her attorneys, and must have been, and was, if they are correct, within their knowledge at the very time it occurred. Neither she, nor her attorneys, or any of them, at that time, or at any other time, until the close of the evidence, at least intimated or suggested that it was the copy and not the original which was read. She, and neither of them, objected to it at all in any way until after the trial was concluded, and in her amended motion for new trial, which was filed some seventeen days after the verdict and judgment. The slightest intimation of this mistake, if it was a mistake, to the court, or the State's attorney, at the time would have righted the matter immediately. Under the circumstances, we think that her action and her attorneys' action, or rather their inaction, at the time was a waiver of the reading of the original, if, as a matter of fact, the copy instead was read. That she could waive it is both statutory (art. 22, C. C. P.) and has repeatedly been decided by this court. Barbee v. State, 32 Texas Crim. Rep., 170; Essary v. State, 53 Texas Crim. Rep., 596; Davis v. State, 70 Texas Crim. Rep., 563. See also Johnson v. State, 75 Texas Crim. Rep., 562, 171 S. W. Rep., 1128; Coffman v. State, 73 Texas Crim. Rep., 295.

On the doctrine of the waiver, Mr. Bishop in his New Cr. Proc., vol. 1, sec. 117, says: "In natural reason one should not complain of a thing done with his consent. And the law, in all its departments, follows this principle. It is analogous to estoppel, or a species of it." In section 119 he says: "Necessity—is the chief foundation for this doctrine. Without it, a cause could rarely be kept from miscarrying. The mind, whether of the judge or the counsel, can not always be held taut like a bow about to send forth the arrow; and if every step in a cause were open to objection as well after verdict or sentence as before, a shrewd practitioner could ordinarily so manage that a judgment against his client might be overthrown. Even by lying by and watching, if he did nothing to mislead, he would find something amiss, to note and bring forward after the time to correct the error had passed."

While introducing the evidence each side introduced the testimony of different witnesses, which was given by them in former trials and taken down in writing. In other words, these witnesses were not on

the stand, but, instead, their testimony as transcribed was introduced. Among these was Mr. Van Horn. After the jury had been charged and retired, they returned in open court, whether at different times or at the same time is not made certain, but at any rate, stated in writing that they did not remember the names of these several witnesses and wanted their testimony read. They mentioned several of these wit-- nesses. Among them, they wanted Van Horn's and asked the court: "Did Mr. Van Horn testify at Pecos, Texas, in the trial of Agnes. Orner that he, Van Horn, heard Mrs. Orner tell Mrs. Archer that she,. Mrs. Orner, killed Lillie Orner?" Over the appellant's objection the court permitted the testimony of said Van Horn to then be read, which. was: "Mrs. Riley (now Mrs. Archer) and myself were at the side of the bed and Harry Shapperd was standing at the foot-like in the room, and she (defendant) was talking to Mrs. Riley, and she turned over and had her arms around her neck that way, and made the remark, she (defendant) said: 'I have killed Lillie! What shall I do! What. shall I do!' At that moment I reached and pulled Mrs. Archer's dress. and motioned for her to go away and she walked away from the bed.. Mrs. Orner said: 'I have killed Lillie! What shall I do! What shall I do!'" Appellant objected that the jury had not disagreed as to Van Horn's testimony; but had forgotten his testimony, and that the reading of it again would prejudice the jury against her and give undue emphasis to his testimony. We think the questions by the jury to the judge sufficiently, if they do not clearly, show when properly construed, that the jury did disagree as to the statement of this witness, and it was the duty of the court, under the circumstances, in the proper and due administration of the law under article 755, C. C. P , to have read, as he did, said testimony of Van Horn. It is literally his testimony as introduced on the trial. No question is made of this. In Clark v. State, 28 Texas Crim. App., 189, it appeared that the trial judge per- mitted the testimony of the deceased witness taken at an examining trial to be reread for the third time to the jury after they had been in retirement considering their verdict two days and nights. The court held that, by the provisions of the statute, if the witness had testified orally, he could be recalled and detail his testimony again as to the points of disagreement, and held that that statute did not expressly provide for the reading of written testimony or the deposition of the witness. The court said:

"Where the evidence is by deposition or in writing taken on exam- ining trial, we can see no good reason why, if the jury so desire, they can not have it reread to them where they have disagreed about it. Such written testimony can not be easily altered.

"At all events, it is to be presumed that it has not been altered until the contrary is shown, and where this is not done we can not perceive how its being reread in the same identical language could mislead the jury or unjustly prejudice defendant. We are unable to see that any error has been committed or wrong done the defendant in this regard.

. . ." Galan v. State, 76 Texas Crim. Rep., 619, 177 S. W. Rep., 124. We think no reversible error is shown in this matter.

The testimony, without reciting it, was amply sufficient to justify the jury to believe that appellant killed her husband by poisoning him with arsenic just about nineteen months before her daughter Lillie was unquestionably killed by the same kind of poison. The testimony, without contradiction, shows that at the time of the death of her husband, she was suspected of killing him by poisoning, and at the time a post-mortem examination was made of him to ascertain if he was killed in that way, but for reasons unnecessary to state here, it was shown that no chemical analysis whatever was made of the organs of his body, or the contents of his stomach or intestines to ascertain what poison, if any, had been administered to him. The testimony further showed that her daughter Lillie repeatedly, when out of humor with her after her father's death, said to her, in substance, "I know you killed papa, and you know that I know it," and, when her daughter would so state to her, she would send her away to play, and tell her not to talk too much, and one witness swore that appellant told her that she was thinking of putting Lillie in a Catholic school, or something of that kind, because Lillie talked too much. It was clearly shown that Lillie, appellant's daughter, was killed by arsenic poison. From the fact that the post-mortem examination of Mr. Orner at the time failed to disclose arsenic poison, the jury were authorized to believe that appellant concluded that, when a person was killed by arsenic poison it could not be detected by a physician. Under these circumstances the court, therefore, committed no error in permitting Lee Newman to testify over her objections that Mrs. Orner, after the death of her husband and before that of her daughter, told him she knew of a poison which, administered to a person, could not be detected by a physician. This evidence, we think, under the circumstances of this case, was clearly admissible.

In her direct examination she testified she traveled considerably with her daughter Lillie, and among other places took her to Los Angeles, and from Los Angeles to Denver, and from Denver to a spring in Kansas, stating the doctor told her to go to the springs with her, and she went there and stayed two months. One of her bills shows that, on cross-examination of her, the district attorney asked if she was at Lundsberg, Kansas. She answered: "Yes." He then asked her if she knew a man there by the name of Alvin Carlson. She answered: "I don't know." He then asked her: "Didn't you go there with a view of marrying him?" She answered: "No, sir; never." The district attorney then asked her if this man Carlson didn't die rather suddenly. Appellant objected to this last question. The court promptly sustained her objections and instructed the jury not to consider the same.

By another bill it is shown that the district attorney, on cross-examination of her, asked if she remembered when she was tried in the County Court for insanity. She answered: "Yes, I guess so. You prosecuted me." He asked if that was before this Lucas child died. She answered: "I don't know." He asked: "Was it before or after

the Lucas child died?" Whereupon appellant objected to this last question, and the court promptly sustained her objection and instructed the jury not to consider the same.

In her. direct examination she testified that Lillie was the only child she had when she lived in El Paso and was the only kin she had in this world. She further testified to her great love for, close attention to, and devotion she had for, her daughter Lillie. It is unnecessary to go into details of her testimony along this line. And, on cross-examination, she was asked, and testified that she had had two other children. That one of these died in infancy of summer complaint in Globe, Arizona. In one of her bills, it is shown that the district attorney asked her if she had not testified in the insanity trial that this child took suddenly sick, and after it died she opened its hand and found a scorpion in it. Her attorney objected to this, and the court overruled the objection and allowed the district attorney to ask said question. The bill in no way shows what her answer was or that she answered the question at all.

She has another bill, in which it is shown that, on cross-examination, she was asked how many children she had. She answered: "Three," and was asked: "When did those two die?" She answered: "The first lived to be nine months old and died with pneumonia." This referred to the child who died in Minnesota. Her attorneys objected to these questions, and their objections were overruled.

We have stated these last four bills so as to consider them together. While we think some of the questions were improper and should not have been asked, yet none of them, nor all of them together, show any prejudice to appellant, nor any reversible error. Such questions, unanswered, or where answered as in this instance, have been many times and repeatedly held by this court to present no reversible error. No injury is shown by any or all of them that could have affected her. There are so many cases by this court holding, as stated, we deem it unnecessary to discuss the question. We will cite some of them. They are all applicable on this point and are decisive against appellant. Phillips v. State, 59 Texas Crim. Rep., 534; Huggins v. State, 60 Texas Crim. Rep., 214; Morrow v. State, 56 Texas Crim. Rep., 519; Hart v. State, 57 Texas Crim. Rep., 24; Warthan v. State, 41 Texas Crim. Rep., 385; Belcher v. State, 39 Texas Crim. Rep., 121; Renn v. State, 64 Texas Crim. Rep., 639; Sweeney v. State, 65 Texas Crim. Rep., 593; Hearn v. State, 73 Texas Crim. Rep., 390; Polter v. State, 70 Texas Crim. Rep., 197.

It is also well established that, even where such questions are answered and the court then withdraws the matter from the jury and instructs them not to consider it, no reversible error is presented. Kinney Miller v. State, 185 S. W. Rep., 29, recently decided but not yet reported, and cases therein cited, among them, Miller v. State, 31 Texas Crim. Rep., 609; Martoni v. State, 74 Texas Crim. Rep., 90, 167 S. W. Rep., 349, and cases therein cited. The questions presented by these bills must have been regarded by appellant and her attorneys at the time as insignificant,

for they did not in either instance regard the matter as of sufficient importance to request the judge in writing to charge the jury to disregard the matters. They certainly thought at the time that the action of the court and his instructing the jury where he did not to consider the matters was amply sufficient as showing no material error against appellant. So that in any event, neither of said bills shows any reversible error.

The testimony of Mrs. Lucile Archer and that of her husband to the effect that they repeatedly heard Lillie Orner, the deceased, after the death of her father and before her death, say to appellant, in substance, "I know you killed papa, and you know that I know it," was clearly admissible. This unquestionably would show, or tend to show, the motive for appellant killing deceased and would form a very material link in the evidence against appellant. Appellant's two bills on this subject show no error.

The only other question is presented by appellant's three last bills. The first of these is to the testimony of Dr. Wright, which gives, in substance, the facts within his knowledge, showing that he was called by appellant to attend her husband, Mr. Orner, a few hours before Orner died. This testimony succinctly states the condition he found Orner in when he was called, what occurred between appellant, Orner and himself about his illness at the time, and what occurred between them between that time and the death of Orner that night. That the next day, upon it being suspected that Orner had been killed by poison, he held a post-mortem examination, took out the organs of his body and placed them in a vessel for the later purpose of having them analyzed to determine whether he had been killed by poison or not. That, because the vessel wherein they were placed contained formaldehyde, a poison itself, the organs and contents were not then chemically analyzed, and that, without such analysis arsenic poison could not be detected. That, upon reaching this conclusion, all the organs of the body, except the stomach, were replaced in the body and interred with it. The effect of his post-mortem examination disclosed, and he testified, that nothing was shown to indicate the man died from any disease.

The next of these bills was to the testimony of Mr. Keaster, the undertaker who buried the body of Orner. His testimony shows that he was present when Dr. Rogers and others disinterred Orner's body, took out the organs thereof, and that they were taken away by Dr. Rogers for the purpose of making a chemical analysis thereof. He further briefly testified which organs were thus taken out, their state of preservation, and the identity of the body of Orner thus disinterred.

The last of these bills was to the testimony of Dr. Rogers. His testimony was to the effect that he had exhumed Orner's body, or what was shown to him to be Orner's body, and that he opened the body where it had been opened previously in said post-mortem examination and took out several organs of the body for chemical examination, and that he then did chemically examine these organs and found arsenic in the

liver alone sufficient to unquestionably produce death from this arsenic poison.

These bills are lengthy, but we deem it wholly unnecessary to copy the testimony therein complained of in full. We have stated briefly the substance of it. Appellant made the same objection to the testimony of each of these witnesses, Dr. Wright, Keaster and Dr. Rogers, which was, that it was immaterial and incompetent and calculated to influence the jury to her prejudice. That it was incompetent in that it goes into the detail of the death of Orner and prejudiced the jury. That it was incompetent and an attempt to charge and prove she was guilty of causing the death of Orner on this trial, without showing any connection between the death of Orner and the deceased herein, and was an attempt to show the commission of an independent crime, and at a time and place other than to which she was on trial, without same having any relation to or connection with this case. That there was no legal proof of the death of Orner being unlawfully caused by appellant, and said evidence was immaterial and irrelevant to any issue in the case, and prejudicial to her rights before the jury. This is the substance in full of her objections to the testimony of each of said witnesses. They are mere objections and are not statements of fact. We have carefully read the testimony of each of these witnesses objected to by appellant. It will be specially noted that in the objections to neither does she in any way point out or specify what of it, if any, went into the details unnecessarily or improperly of the death of Orner. It was important, quite so, for the State to prove a motive on appellant's part for poisoning her own eleven-year-old daughter. The testimony was sufficient clearly to show that this daughter had repeatedly accused appellant of the murder of her father, and stating that appellant knew that she knew it. Then it became proper for the State to show that, as a matter of fact, the deceased's accusations were true, and in order to prove that they were true, it was proper and necessary for the State to show, in substance, as it did, by the testimony of these witnesses, that Orner did not die a natural death but was killed by arsenic poison. And the testimony of these witnesses was sufficient, clearly so, to justify the jury to believe that appellant killed her husband by arsenic poison, that her daughter Lillie knew it, that she knew that Lillie knew it, and that, therefore, this showed the motive for the killing of her own child. We have carefully, as stated, read this evidence and have failed to find any unnecessary detail therein of the death of Orner. Appellant, neither by her bill nor by her objections, points out any such unnecessary detail. Under such circumstances it is well settled by the decisions of this State, as stated in the death penalty case of Ortiz v. State, 68 Texas Crim. Rep., 526, that, when a bill of exceptions includes a number of statements objected to, some of which are clearly admissible, and there is nothing in the objection directly pointing out the supposed objectionable portions thereof, such bill presents no error. Judge Davidson in that case cites Branch's Crim. Law, sec. 47; Payton v. State, 35 Texas Crim. Rep., 508; Tubbs

v. State, 55 Texas Crim. Rep., 606; Cabral v. State, 57 Texas Crim. Rep., 304. Many other cases could also be cited. But we regard the question as so well settled and established that it is unnecessary to collate any of the others. That some of the testimony, if not all of it, of each of these witnesses so generally objected to was admissible, there can be no doubt.

The evidence was conflicting. Some of the witnesses were impeached by showing contradictory statements by them, and in some instances of additional testimony which they did not give in previous trials. Mrs. Orner herself testified, denying that she killed by poison either her husband or her daughter, and in effect denied every other criminative fact and circumstance against her. However, the testimony as a whole, and that of the State without doubt, was amply sufficient to show that appellant was guilty of the crime for which she was convicted and that no other person than she killed deceased.

The State did not try, nor pretend to try, appellant for the killing of her husband in this case. The testimony that was introduced to prove that she killed her husband was clearly admissible, as stated, and the court plainly told the jury in his charge that all the evidence introduced with reference to the death of Orner, if considered by them at all, could be considered only for the purpose of showing motive, if any, for the killing of Lillie Orner, and could be considered by them for no other purpose whatever. In fact, the charge is a most admirable one. It presents every issue raised by the evidence, and in every way protects, so far as a judge should, the appellant and her rights in the consideration of the case by the jury. No complaint whatever is made of the charge of the court. No reversible error whatever is shown by this record. The penalty for murder by poisoning is fixed by the statute at either death or imprisonment for life. The jury assessed what is universally regarded as the lowest penalty they could in a case of this character, life imprisonment. The judgment is, therefore, affirmed.

*Affirmed.*

March 6, 1916.

DAVIDSON, JUDGE (dissenting).—I wrote an opinion reversing and remanding, but my associates believing the judgment ought to be affirmed took the record and affirmed. I can not agree with their conclusion.

The testimony, and the case generally, is materially changed on this appeal from what it was when before the court on former appeal, found reported in 65 Texas Crim. Rep., 137. After the reversal on the former appeal the case was transferred to Presidio County, thence to Reeves County, thence to Culberson County, and back to El Paso County, its initial point. There seems to have been hung juries in all counties except El Paso.

The witnesses Van Horn and Mrs. Archer testified on this trial that appellant stated, in effect, that she killed her child. Van Horn seems to have been a new witness, coming into the case after the former

appeal. Mrs. Archer had always denied, until Van Horn became a witness, in all of her testimony and at all times, that appellant ever made a statement indicating that she was connected with the death of her child. There is considerable testimony in the record bearing on this feature of the change she made in her testimony. It seems it was due almost entirely, largely at least, to the influence of Van Horn and conferences she had with the judge and prosecuting attorney. During the trial at which she changed her testimony she had positively denied any confession or remark of any sort by appellant incriminating herself. After the new male witness came into the case, and after the judge and prosecuting attorney had interviewed her, and during the argument of the case, she went back upon the stand and testified as stated above, indicating that appellant had virtually made a confession to killing the child. This was a radical change in her testimony and in direct contradiction of what she had always theretofore sworn. There is also testimony in connection with the immediate sickness of the deceased child that one J. D. Lea may have administered poison to the child. The theory of the State was that appellant administered arsenic to the child in a cup of coffee. Appellant introduced evidence showing that if arsenic was administered to the child it was done by Lea. Lea did not testify on this trial. In this connection it is shown that Lea boarded with appellant, and that he and the deceased girl ate dinner together. Appellant was not at the table, but was ironing a dress for her little girl to wear to a social function later in the day and during that evening. While Lea and the child were at the table Lea called for coffee. Appellant took from the kitchen to the table the coffee, and it seems to have been poured out by Lea into two cups, one for himself and one for the child. There may be some issue as to whether appellant or Lea poured out the coffee, but as I understand the record Lea poured it out for himself and the little girl. Lea took one of the cups of coffee and the little girl the other cup. The little girl drank her coffee, but Lea did not drink his, but called for tea. Appellant brought him the tea, which he drank. Lea also did the carving and serving at the table for the two, and he and the little girl being those at the table. Immediately after drinking his tea he got up, excused himself, and went away hurriedly, stating he had a business affair that called for his immediate attention. The little girl went out to play and shortly afterwards came in complaining of being very sick at her stomach. The evidence clearly shows that Lea had made, before the above mentioned occurrences, indecent proposals to appellant, which she indignantly spurned. After the death of her child he again approached her on more than one occasion. These matters she again emphatically declined. These matters occurred several times, and accompanying her declinations he made statements to the effect that she would regret it and that he could be of great service to her, etc. This is some of the evidence for defendant's side of the case. She took the stand and emphatically denied poisoning her child. The State further introduced evidence to the effect that the little girl when angry with her mother,

or her mother had declined to let her have her way about things, stated on one or more occasions that appellant had killed her father, Captain Orner, and that appellant knew that she, the child, knew that fact. The father died some years previously. This seems to have been introduced by the State and relied upon as a motive against appellant and over her objections. The State further introduced facts, circumstances and details of the sickness as well as many other matters which resulted in the death of Captain Orner. Without burdening this opinion with these occurrences, it is sufficient to say that the State introduced all facts connected with the sickness of Captain Orner and the doctor's visit and his refusal to return when called by appellant over the telephone several times to the bedside of her sick husband, and that another party also called the physician, who finally came, but too late. This covers several pages of the record. Captain Orner had died before the physician reached the house. He made an autopsy of the body and discovered no evidence of poison. He was buried, and five years later his body was exhumed, and a portion of the liver and stomach were taken as a basis for chemical analysis, the result of which was the chemist stated that this analysis indicated the presence of arsenic enough to have produced death. All details of this whole matter were gone into from the time of his sickness until the exhuming of the body, and all facts in minute detail connected therewith, and it covers a great portion of this record. It would be fully difficult to ascertain from the testimony whether the State was prosecuting appellant for the death of the husband or that of the child. The trial court admitted, and the majority of this court sustained the regularity of this matter on the theory that it showed motive. It would be more than doubtful if appellant had been on trial under an indictment charging her with the death of her husband that the State would have had sufficient evidence to have asked the jury for a conviction. So the whole thing amounted to a full trial of appellant for the killing of her husband as a preliminary motive for the killing of the child. There was an attempt also to prove that two of her young children had died suddenly, one in Arizona, and the other in Minnesota. The State also placed testimony into the case or sought to do so that appellant had gone to some point in Kansas in answer to an advertisement, apparently of marriage, and the man who did the advertising also died suddenly. Defendant had to meet all these things either by objection or testimony. Her two children died, one from what the physicians termed "summer complaint," and the other from pneumonia. What the Kansas City man died with is not established. This going there to meet this man she denied, but all these matters in one way or another were brought to the attention of the jury. Some were excluded, it is true. In other words, briefly summed up, the State sought to try appellant on the theory that she had a confirmed mania for killing people by poison, and especially arsenic poison.

That the State may introduce evidence to show motive does not authorize the going into the trial of another case or other cases. If

there was a motive which prompted the accused to kill or do a certain thing, evidence of that motive may be introduced if it tends to solve the action of the defendant in doing the act then under investigation. For instance, the State could show that appellant killed her child by poisoning, if the testimony was at hand, for fear she might divulge something that could incriminate her in the death of the husband or ill-will towards the child. A motive for a homicide is legitimate testimony, but it can not be held for this reason that the State can turn aside from trying the main case to try another homicide in all of its details and circumstances. If the State should be permitted to do so the accused would have the right to meet all these facts and circumstances by the best testimony available. This is so well settled it is not a question now to be debated. It is the universal rule that where one side puts in a fact damaging to the other side, that that party may meet this fact by any testimony within its power. It is not clear to the mind of the writer but what the State prosecuted appellant in this case with equal vigor, if not with more determination, for the death of Captain Orner than that of the child. Appellant received life imprisonment in the penitentiary on what the writer believes to be anything but a clear case of circumstantial evidence. The jury went out to find a verdict with full details of both homicide cases before them. There can be no question in the mind of the writer, under the authorities in this State, that this was clearly erroneous. It has been the subject of numerous decisions, none of which are overruled. I might refer to the cases of Menefee v. State, 67 Texas Crim. Rep., 201, 149 S. W. Rep., 138; Chandler v. State, 60 Texas Crim. Rep., 329; Ware v. State, 36 Texas Crim. Rep., 597; Pace v. State, 58 Texas Crim. Rep., 90.

In the Menefee case, supra, this question was one of the most serious in the case, and it was one of the grounds upon which the judgment was reversed. It may be a serious question even that the statement of the little girl was admissible, but what I have said has been on the theory that such statement was admissible. But what I have said is further based on the theory that the statement of the child was made to or in the hearing of her mother and charged her with the killing of her deceased husband. This was all denied on the trial. It will be noticed in the statement of the child that nowhere does it include the idea that Captain Orner died from poison. All she stated was that appellant knew that she, the child, knew that appellant had killed her father. These other circumstances with reference to the sickness and manner of death, the exhuming of the body five years later, and all these matters, were injected into the case in order to show that he died from poison, and this was engrafted into the statement of the child not as a fact but a presumption only. It seems to me it was one presumption based upon another presumption, and should not have been permitted. The whole matter seems to be but presumptions upon presumptions. The little child was very small at the time of the death of Captain Orner, she being only about ten years of age at the time of her death. It was sought to prove, and was gotten before the jury,

but which was partly excluded by the court, that prosecutrix had a system or general plan of killing people by poison. This was all woven into the trial and its effect evidently remained. There is much of this in the record; so much so it could not have been otherwise than very injurious to appellant. This of itself should have been held sufficient error to reverse. It was not admissible testimony, and the State now seeks to avoid the consequences by urging to this court, and was sustained by the majority of the court, that it was excluded from the jury. There was testimony also with reference to the fact that two of appellant's children had died suddenly, one in Minnesota and the other in Arizona. These are mentioned simply to show how the prosecution was conducted. These children did not die from poison. This manner of trying a case is violative of the rules of evidence and fairness, and should not have been permitted. Just what effect it had upon the jury would be somewhat speculative, but the verdict indicates it, for she received the life sentence. All this evidence may have been and doubtless was the turning point against appellant, resulting in her conviction. It has been so often decided in Texas that guilt can not be imputed to a defendant by proving that other offenses were committed by somebody in a similar manner to the one for which the accused is being tried or that the other offense having been committed by the accused, therefore this case was. It is deemed unnecessary to cite authorities. Sometimes extraneous crimes are admissible to show intent, to connect the defendant with the offense on trial, show system, res gestae and matters of that sort, but nowhere, so far as the writer is informed, has it been held the State can prove that because an offense was committed at some time and place under similar circumstances to the one on trial that the State can introduce those facts or that case and attendant circumstances to show thereby or draw the conclusion therefrom that the accused may have committed the other offense, therefore he committed this offense. There are many reasons why this can not be done. One of the most familiar I may state is that it is a turning aside to try other offenses which involve the guilt or innocence of the accused, not in this case but in the other case, and that by being guilty of the other offense, therefore, she might be guilty of the offense for which she is being tried. There is also another, that is, the State or defendant will not be permitted to turn aside and try another case in detail, even on the question of motive or for any other reason. See cases already cited.

There was also evidence permitted to go to the jury which the writer thinks inadmissible, to the effect that appellant made a statement to one of the witnesses that she knew a secret poison which would kill, but which could not be detected in the body. Various objections were urged to this in the light of the record which the writer thinks ought to have been sustained. The little girl was poisoned by means of arsenic, the easiest of all poisons detected in the body of a deceased person. It was following out the general line of introducing facts that ought not to have been introduced to influence the jury in regard to their verdict.

In other words, it is the purpose of the writer to say that appellant was entiled to a fair trial on legitimate testimony, and it would be difficult to find a case where a judge should be more careful in the admission of illegal testimony and guarding the rights of the accused than is presented by the record in this case. An innocent ten-year-old child alleged to have been killed by her mother by administering arsenic as a poison was and is of itself a serious charge and one likely to affect the jury at the beginning and before testimony was introduced. But all these other matters, the details of the life of the accused, the details of other supposed offenses, and the impressions sought to be made upon the jury that she was an arsenic fiend, and that it was her business in life to thus kill people, and especially by poisoning with arsenic, and those nearest and closest to her, was permitted to go to the jury as evidence. It would be useless to answer this from the standpoint of human nature. There is evidence also that appellant was thought to be insane, and that she was tried in the County Court under a charge of insanity after the death of her child, and was prosecuted there on that issue by State's counsel. If all these matters introduced were introduced in the County Court I might express a little surprise that the jury did not find her insane.

There are other questions that are, in my judgment, reversible, but I do not purpose to go further into these matters. I believe and am firmly convinced this judgment ought not to have been affirmed. Appellant was entitled to at least a fair trial, and this case especially called for extreme caution because of the condition of things that environed this case on the trial. I, therefore, respectfully dissent.